# United States Court of Appeals
## For the First Circuit

No. 04-2721

VISITING NURSE ASSOCIATION GREGORIA AUFFANT, INC.,

Plaintiff, Appellant,

v.

TOMMY G. THOMPSON, in his capacity as Secretary of the United
States Department of Health and Human Services; RUBEN J. KING-
SHAW, JR., as the Deputy Administrator and Chief Operating
Officer of the Centers for Medicare and Medicaid Services;
UNITED GOVERNMENT SERVICES,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
[Hon. José Antonio Fusté, U.S. District Judge]

Before

Torruella and Lipez, Circuit Judges
and Gibson,* Senior Circuit Judge

Héctor J. Pérez Rivera and Carlos R. Pastrana-Torres, with
whom Goldman, Antonetti & Córdova, P.S.C., were on brief, for
appellants.
Maryalice Kozak, Assistant United States Attorney, with whom
José M. Pizzaro-Zayas, Assistant United States Attorney, and H.S.
García, United States Attorney, were on brief, for appellees.

May 8, 2006

---

* Of the Eighth Circuit, sitting by designation.

**LIPEZ, <u>Circuit Judge</u>**.    Medicare, a health insurance program, is administered by the Secretary of Health and Human Services through the Centers for Medicare and Medicaid Services. The Secretary is entrusted by the Medicare Act with the authority to issue regulations that are necessary for the administration of the health insurance program.    Under the Act, providers are reimbursed the lesser of their charges or their reasonable costs incurred in providing covered services to Medicare beneficiaries. 42 U.S.C. § 1395f(b).  The Act requires the Secretary to promulgate regulations to interpret "reasonable costs".

This case involves a challenge to the applicability of interpretive regulations adopted by the Secretary that provide for the reimbursement of "necessary and proper" costs related to patient care under the Medicare program.  The case also raises a related issue involving the timing of the Secretary's decision denying reimbursement of the costs at issue in this case.  We affirm the district court's ruling affirming the decision of the Secretary.

## I.

### A.  Factual and Procedural Background

Plaintiff-Appellant Visiting Nurse Association Gregoria Auffant, Inc. ("Plaintiff" or "VNA") is a non-profit corporation organized and existing under the laws of the Commonwealth of Puerto

Rico.[1]  For the time period at issue here, VNA was a Home Care Medicare provider within the meaning of the Medicare Act, 42 U.S.C. § 1395, et seq.  Plaintiff owns three subsidiary providers in the Medicare program: VNA Hato Rey, VNA Bayamón, and VNA Carolina. Defendant-Appellee Tommy G. Thompson was the Secretary of the Department of Health and Human Services.[2]  Defendant-Appellee Ruben J. King-Shaw, Jr. is the Deputy Administrator and Chief Operating Officer of the Centers for Medicare and Medicaid Services ("CMS"). King-Shaw (the "Administrator") signed the CMS decision at issue here.  Defendant-Appellee United Government Services ("UGS"), the intermediary between Medicare and Plaintiff, conducted the initial review of Plaintiff's cost reports discussed below.

In July 1994, VNA instituted a Deferred Compensation Plan ("Plan" or "DCP") for its employees pursuant to which VNA paid a deferred "salary differential" for each employee participating in the Plan.  Plaintiff claimed these contributions to the Plan as costs on its Medicare cost reports for fiscal years 1994-1997.  UGS reviewed Plaintiff's cost reports for those fiscal years, determined that the Plan did not comply with Medicare rules and

---

[1] This area of law is rife with the use of acronyms.  To help the reader understand them, we attach an appendix containing a glossary of the less common acronyms used in this opinion.

[2] Tommy G. Thompson is no longer the Secretary of Health and Human Services.  Pursuant to Fed. R. Civ. P. Rule 25(d), Michael O. Leavitt is automatically substituted in his place.

-3-

regulations, and disallowed reimbursement of costs in the amount of $353,521.[3]

Plaintiff appealed UGS's decision to the Provider Reimbursement Review Board ("PRRB" or the "Board"), which held a hearing on November 19, 2001. On August 9, 2002, the Board reversed UGS's decision. The Board concluded that VNA was entitled to reimbursement for its contributions to the Plan, finding that: (1) UGS never informed VNA that the Plan was invalid; (2) VNA used outside advisors and consultants to establish the Plan; (3) the Plan's terms were contained in the personnel by-laws; and (4) VNA created the Plan intending it to be a permanent arrangement. In summary, the Board reversed UGS's decision on the grounds that the Plan was in "substantial compliance" with the provisions of the Medicare Provider Reimbursement Manual ("PRM" or the "Manual"); and any non-compliance of the Plan from the requirements set forth in the Manual was de minimus.

On August 16, 2002, pursuant to 42 C.F.R. § 405.1875, which provides specifically for appeals from decisions of the Board, UGS requested a review of the Board's decision, alleging that the decision was contrary to the rules and standards contained in the Manual. On August 26, 2002, the Administrator notified the

_____

[3] UGS initially reviewed VNA's cost reports for fiscal years 1996 and 1997 only. After finding non-compliance in these reports, UGS reopened the cost reports for 1994 and 1995, adjusting those costs related to the Plan.

-4-

parties of its intention to review the Board's decision. VNA was also notified that the Administrator would issue his decision, which constitutes the Secretary's final decision, within sixty (60) days of VNA's receipt of the Board's decision.

On October 8, 2002, the Administrator reversed the decision of the Board, finding that the Plan did not qualify as a formal DCP. Specifically, the Administrator found that VNA had not deposited its contributions with an appropriate funding agent; the Plan was contingent rather than permanent in nature; and the Plan did not meet the requirements for Medicare reimbursement as a formal DCP for the 1994-97 period. On October 10, 2002, the Administrator's decision was sent to VNA by certified mail.

On December 3, 2002, VNA requested review of the Administrator's decision in federal district court pursuant to the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701-06. VNA eventually moved for summary judgment; Defendants opposed the motion and submitted a cross-motion for summary judgment. On September 30, 2004, the district court issued an order denying VNA's summary judgment motion and granting Defendants' motion, affirming the decision of the Secretary. This appeal followed.

## B. Standard of Review

We review a district court's grant of summary judgment de novo. Dominquez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 428 (1st Cir. 2000). However, "this rubric has a special twist in the

administrative law context." <u>Associated Fisheries of Maine, Inc.</u> v. <u>Daley</u>, 127 F.3d 104, 109 (1st Cir. 1997). "Because the APA standard affords great deference to agency decisionmaking and because the Secretary's action is presumed valid, judicial review, even at the summary judgment stage, is narrow." <u>Id.</u> Pursuant to 42 U.S.C. § 1395oo(f)(1), judicial review of the reimbursement decision is governed by the standards detailed in the APA. Thus, we may only set aside agency actions, findings, and conclusions if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence". 5 U.S.C. § 706(2). Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson</u> v. <u>Perales</u>, 402 U.S. 389, 401 (1971). Additionally, in the situation here, the district court acts as an intermediate appellate court. Therefore, "when reviewing agency action, we apply the same legal standards that pertain in the district court and afford no special deference to that court's decision." <u>Associated Fisheries</u>, 127 F.3d at 109.

Furthermore, "[w]here Congress has entrusted rulemaking and administrative authority to an agency, courts normally accord the agency particular deference in respect to the interpretation of regulations promulgated under that authority." <u>South Shore Hosp., Inc.</u> v. <u>Thompson</u>, 308 F.3d 91, 97 (1st Cir. 2002); <u>see</u> <u>also</u> <u>Bowles</u>

v. <u>Seminole Rock & Sand Co.</u>, 325 U.S. 410, 414 (1945). "Courts withhold such deference only when the agency's interpretation of its regulation is plainly erroneous or inconsistent with its language." <u>South Shore Hosp.</u>, 308 F.3d at 97 (internal citations and quotation marks omitted). "In situations in which the meaning of regulatory language is not free from doubt, the reviewing court should give effect to the agency's interpretation so long as it is reasonable, that is, so long as the interpretation sensibly conforms to the purpose and wording of the regulations." <u>Martin</u> v. <u>Occupational Safety & Health Review Comm'n</u>, 499 U.S. 144, 150-51 (1991)(internal citations and quotation marks omitted).

However, pronouncements in manuals like the PRM, which do not have the force of law, are entitled to less deference than an interpretation arrived at after a formal adjudication or notice-and-comment rulemaking. <u>See</u> <u>Christensen</u> v. <u>Harris County</u>, 529 U.S. 576, 587 (2000) (explaining that administrative interpretations receive <u>Skidmore</u> deference rather than <u>Chevron</u> deference). We proceed with these standards in mind.

## II.

### A. Timing of the Decision of the Administrator for the Centers for Medicare and Medicaid Services

42 U.S.C. § 1395oo(f)(1) states in relevant part that "[a] decision of the [PRRB] shall be final unless the Secretary, on his own motion, and within 60 days after the provider of services

is notified of the Board's decision, reverses, affirms, or modifies the [PRRB]'s decision." In turn, 42 C.F.R. § 405.1875(g) states in relevant part:

> (1) If the Administrator has notified the parties and CMS that he or she has decided to review a [PRRB] decision, the Administrator will affirm, reverse, modify or remand the case.
> (2) The Administrator will make this decision within 60 days after the provider received notification of the [PRRB] decision and will promptly mail a copy of the decision to each party and to CMS.

Both the statute and the regulations implementing the statute require the Administrator -- who acts with the authority of the Secretary -- to conduct and conclude his review of a Board decision within a 60-day period. VNA asserts that the Administrator failed to make his decision within that 60-day period. As a result, VNA argues that the Board decision is final, and the Administrator's silence constitutes approval of the Board's decision.

There is no factual dispute that: (1) the Board issued its decision on August 9, 2002; (2) the Administrator signed and dated his decision on October 8, 2002; and (3) the Administrator's decision was mailed to VNA on October 10, 2002. Plaintiff contends that 42 C.F.R. § 405.1875(g)(2) requires the Administrator to make his decision and mail that decision within the 60-day window. The relevant dates for this proposition would be August 9, 2002, and October 10, 2002; sixty-one (61) days would have elapsed using this scenario. With the Secretary not having complied with the applicable time requirements, the Board's decision would be final.

-8-

However, Plaintiff's argument is predicated on an unnatural reading of the regulatory language. 42 C.F.R. § 405.1875(g)(2) reads that "the Administrator will make this decision within 60 days . . . and will promptly mail a copy." If the regulation required the Administrator to make his decision and mail it within 60 days, the regulation would have placed "within 60 days" at the end of the regulation. Then the 60-day period would apply to both the making of the decision and its mailing. However, the plain language of the regulation states that the Administrator need only make his decision within the 60-day period. He must then mail his decision promptly thereafter, which is what the Administrator did. The date the Administrator signed his decision is the appropriate date to use in calculating whether the Administrator complied with the 60-day period. Using that day, October 8, 2002, the Administrator made his decision in fifty-nine (59) days, within the 60-day period detailed in both the statute and the regulations. As a result, the CMS Administrator's decision was properly before the district court.[4]

---

[4] Defendants also argue, in the alternative, that the day the 60-day window began should be August 13, 2002, not August 9, 2002, asserting that the 60 days begins to run when a plaintiff receives actual notice of the Board's decision. Defendants based this argument on our decision in Hospital San Jorge v. Secretary of Health, Education, and Welfare, 616 F.2d 580 (1st Cir. 1980). There, we held that the 60-day time period under 42 U.S.C. § 1395oo(f)(1) commences the date the party receives notice of the decision through the mail. Id. at 585 n.6. In that case, we assumed that a mailing took four days. Id. In light of Hospital San Jorge, the district court found Defendants' alternative timing

-9-

**B. The Applicability of the Provider Reimbursement Manual**

Plaintiff makes two attempts to avoid the applicability of the Manual to the Plan. VNA first argues that the Manual is just a "codified interpretation" of the Employee Retirement Income Security Act ("ERISA"). Since the Plan complied with ERISA, according to Plaintiff, it was entitled to Medicare reimbursement. This argument is unsupported by any authority.

The Manual anticipates different types of retirement plans that a Medicare provider may offer to its employees. In §§ 2140.1-2140.6, the Manual sets forth the rules governing the broad category of retirement plan involved in this case -- the deferred compensation plan. In subsequent sections, specifically §§ 2141.1-2141.7 and §§ 2142.1-2142.7, the Manual sets forth the rules governing two subcategories of a DCP, the "defined contribution deferred compensation plan" and the "pension plan", respectively.

In support of its position that the PRM "codifies" ERISA, Plaintiff asserts that "[n]owhere in the PRM is a conceptual link between said Manual and ERISA more clearly suggested and easily apparent, than in Section 2141.1 of the PRM." In § 2141.1, the Manual states in relevant part that: "Defined contribution deferred compensation plans include profit sharing, stock bonus, and other such defined contribution deferred compensation plans that meet

argument also valid. We agree with the district court that this decision supports equally well the conclusion that the Administrator's decision was issued within the 60-day period.

-10-

Internal Revenue Service ("IRS") or [ERISA] requirements as qualified plans and have been so approved by the IRS."

First, § 2141.1 defines the DCP subcategory of "defined contribution deferred compensation plans" only; the Plan at issue here does not fall into that category. As noted, the Plan at issue here falls into the general category of a deferred compensation plan, which is governed by §§ 2140.1-2140.6. Those sections do not refer to ERISA. Second, and more importantly, the reference to ERISA in § 2141.1 is only used to distinguish a deferred compensation plan that qualifies as a "defined contribution deferred compensation plan" from one that does not. Even for the defined contribution deferred compensation plan, there is no suggestion that the PRM is simply a codified interpretation of ERISA. Indeed, whether for a "regular" deferred compensation plan or for a defined contribution deferred compensation plan, the question of Medicare reimbursement would be determined by the Medicare Act and its related regulations, not ERISA. ERISA is irrelevant to the issue of Medicare reimbursement for contributions to a DCP.

In a second attempt to avoid the applicability of the Manual to the Plan, Plaintiff argues that the Manual was preempted by ERISA. ERISA states in relevant part that "[n]othing in this subchapter shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States . . . or any rule

-11-

or regulation issued under any such law." 29 U.S.C. § 1144(d). The plain language of the statute exempts from preemption any federal law, and any rule or regulation issued under federal law. VNA asserts that the Manual, as a whole or in part, is not a valid rule or regulation issued under federal law, and hence it is not protected from ERISA preemption.[5]

VNA's reliance on ERISA is again misguided. If the provisions of the Manual at issue are invalid on the basis of familiar administrative law principles (which Plaintiff contends), they would not apply to the Plan on that basis alone, irrespective of ERISA. If the provisions are valid, they are protected from ERISA preemption.[6] Thus, the critical question in this appeal is whether the particular sections of the PRM relied on by the Administrator are valid rules of the Secretary.

---

[5] In its appellate brief, VNA seems to challenge the Manual, which is comprised of many provisions, as a single rule. The relevant cases that we have found involve challenges to a particular section or provision of the Manual. See, e.g., Shalala v. Guernsey Mem'l Hosp., 514 U.S. 87 (1995). Given the focus of Plaintiff on the sections of the Manual that the Administrator applied -- PRM §§ 2140.1-2140.3, the sections regulating reimbursement of DCPs -- we interpret VNA's position as a challenge to the validity of the specific provisions of the Manual at issue.

[6] Although Plaintiff argues that the provisions of the PRM are not interpretive rules, the clearly are, as the ensuing discussion demonstrates. See Shalala v. Guernsey Mem'l Hosp., 514 U.S. 87, 99 (1995).

In _Shalala_ v. _Guernsey Memorial Hospital_, 514 U.S. 87 (1995), the Supreme Court found that § 233 of the Manual[7] "is a prototypical example of an interpretive rule issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers."  _Id._ at 99.  The Court continued: "[i]nterpretive rules do not require notice and comment . . . they also do not have the force and effect of law and are not accorded that weight in the adjudicatory process."[8]  _Id._  Finally, the Court held that if § 233 had "adopted a new position inconsistent with any of the Secretary's existing regulations," the APA's notice-and-comment rulemaking process would be required.  _Id._ at 100.  So long as an interpretive rule does not "effec[t] a substantive change in the regulations," notice-and-comment is not required and the interpretive rule is valid.  _Id.;_ _see_ _also_ _Levesque_ v. _Block_, 723 F.2d 175, 182 (1st. Cir. 1983) (citing _Skidmore_ v. _Swift & Co.,_ 323 U.S. 134, 139-40 (1944)).

In _Christensen_, the Supreme Court "confront[ed] an interpretation contained in an opinion letter, not one arrived at

---

[7] Section 233 of the PRM describes the way in which a cost associated with capital indebtedness should be recognized, "whether the loss should be recognized at once or spread over a period of years."  _Guernsey_, 514 U.S. at 97.  Section 233 requires that "defeasance losses should be amortized."  _Id._

[8] There is no dispute that the provisions of the Manual were not subject to the notice-and-comment rulemaking procedures of the APA.

after, for example, a formal adjudication or notice-and-comment rulemaking." 529 U.S. at 587. The Court concluded that:

> [I]nterpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law -- do not warrant Chevron-style deference. Instead, interpretations contained in formats such as opinion letters are "entitled to respect" under our decision in Skidmore v. Swift & Co., but only to the extent that those interpretations have the "power to persuade."

Id. (internal citations and quotation marks omitted). While it is true that rules found in manuals such as the PRM are entitled to less deference than interpretations arrived at after a formal adjudication or notice-and-comment rulemaking, this does not mean that the rules in the Manual are not entitled to any deference at all. If an interpretive rule is neither inconsistent with promulgated regulations, nor outside of the coverage of the Act, it is valid. Furthermore, as the Supreme Court stated in Thomas Jefferson University v. Shalala, 512 U.S. 504 (1994), "broad deference [to the administrative agency] is all the more warranted when, as here, the regulation concerns a complex and highly technical regulatory program." Id. at 512 (internal citations and quotation marks omitted); see also Auer v. Robbins, 519 U.S. 452 (1997) (holding that an agency's interpretation of its own ambiguous regulation is entitled to deference); Bowles v. Seminole Rock & Sand Co., 325 U.S. 410 (1945). Medicare certainly qualifies as such a "technical regulatory program".

Plaintiff challenges the contention that §§ 2140.1-2140.3 of the PRM are valid interpretive rules whose requirements determine whether contributions to a DCP were necessary, proper, and reasonable -- and therefore reimbursable -- under the Medicare Act and its implementing regulations. Section 2140.2 of the PRM states:

> Provider contributions for the benefit of employees under a deferred compensation plan are reimbursable when, and to the extent that, such costs are actually incurred by the provider. Such costs are found to have been incurred only if the requirements of sections 2140ff[][9] are met . . . . Provider payments under unfunded deferred compensation plans are considered an allowable cost only when actually paid to the particular employee and only to the extent considered reasonable.

(Footnote added.) Under PRM § 2140.3, a provider must also:

> [a]dequately communicate the proposed plan to all eligible employees, enabling them to make an informed decision on whether to participate in the plan. A formal plan is one that is provided for in a written agreement executed between the provider and the participating employees.

Additionally, the plan must be a "permanent" one that: (1) details the method for calculating all contributions to the fund established under the plan; (2) is funded according to the requirements of section 2140.3B;[10] (3) designates how the plan's

---

[9] "[S]ections 2140ff" refers to Section 2140 in its entirety, from §§ 2140.1-2140.6. Section 2140 is the entire portion of the PRM dealing with deferred compensation.

[10] Section 2140.3B, entitled "Funding of Deferred Compensation Plans", describes in detail the recognized ways of funding a DCP, including commercial insurance, trust funds, and custodial bank accounts.

assets are to be protected; (4) provides the requirements for benefits to vest; (5) gives the basis for the compensation of the amount of the benefits to be paid; and (6) will continue regardless of normal fluctuations in the provider's economic experience. PRM § 2140.3.

Insofar as these sections effect neither a substantive change in the regulations nor the Medicare Act, they constitute valid interpretive rules. While neither the Medicare Act nor the subsequent regulations specify the requirements for DCPs, this omission does not mean that there can be no such requirements. In Guernsey, the Court stated that "[w]e also believe it was proper for the Secretary to issue a guideline or interpretive rule" in the form of a section of the PRM. 514 U.S. at 97.

The Medicare Act states that "[t]he reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services." 42 U.S.C. § 1395x(v)(1)(A). The Act grants the Secretary broad discretion in determining what is a "reasonable cost" under the Act, 42 U.S.C. § 1395x(v)(1)(A) ("In prescribing the regulations referred to in the preceding sentence, the Secretary shall consider . . . ."), and in determining what information is required from providers as a

condition of payment, 42 U.S.C. § 1395g(a).[11]  The statute provides a broad definition of "reasonable cost":

> The reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services. . . .

42 U.S.C. § 1395x(v)(1)(A).

Regulations promulgated by the Secretary to implement the Act state that reimbursement of these costs is "subject to principles relating to specific items of revenue and cost."  42 C.F.R. § 413.9(a).  The burden of proof is on the provider seeking reimbursement to demonstrate whether a cost is eligible for reimbursement.  42 C.F.R. §§ 413.20, 413.24.  Payments to providers "must be based on the reasonable cost of services covered under Medicare and related to the care of beneficiaries."  42 C.F.R. § 413.9(a).  Additionally, providers must maintain sufficient financial records and statistical data for the accurate determination of reimbursable costs for services to beneficiaries

---

[11] 42 U.S.C. § 1395g(a) states in relevant part:

The Secretary shall periodically determine the amount which should be paid under this part to each provider of services with respect to the services furnished by it . . . . [N]o such payments shall be made to any provider unless it has furnished such information as the Secretary may request in order to determine the amounts due such provider under this part for the period with respect to which the amounts are being paid or any prior period.

using "[s]tandardized definitions, accounting, statistics, and reporting practices that are widely accepted in the hospital and related fields."  42 C.F.R. § 413.20(a).

Given the enormous variety of payments to providers that the Secretary considers in making reimbursement decisions, the regulations that the Secretary has issued to explain "reasonable cost" use general language by necessity.  For example, 42 C.F.R. § 413.9 defines "necessary and proper costs", the type of costs at issue here, as: "costs that are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities.  They are usually costs that are common and accepted occurrences in the field of the provider's activity."  To give content to the concept of reasonable cost, the Manual details the specifics of reimbursement.

The deferred plan specifications found in the Manual, specifically §§ 2140.1-2140.3, do not contradict or conflict with the requirements articulated in the Medicare Act and its regulations.  They detail the requirements for determining and confirming reasonable costs under a DCP, pursuant to the requirements of the regulations.  These interpretive rules are not beyond the pale of what other courts have found acceptable.  See, e.g., Cmty Hosp. of Monterey Peninsula v. Thompson, 323 F.3d 782, 790-93 (9th Cir. 2003) (holding that the PRM's allowable debt reimbursements were neither arbitrary nor capricious); Mt. Sinai

-18-

<u>Hosp. Med. Ctr.</u> v. <u>Shalala</u>, 196 F.3d 703, 709 (7th Cir. 1999) (concluding that PRM requirements that mandate providers collect Medicare and non-Medicare debts with the same methods were reasonable and not violative of the APA); <u>see</u> <u>also</u> <u>Creighton Omaha Reg'l. Health Care Corp.</u> v. <u>Bowen</u>, 822 F.2d 785 (8th Cir. 1987); <u>St. Mary's Hosp. of Troy</u> v. <u>Blue Cross and Blue Shield Assoc.</u>, 788 F.2d 888 (2d Cir. 1986). These courts accorded deference to the Secretary's interpretive provisions contained in the Manual, and upheld disallowances of Medicare costs based on those provisions, despite the fact that those provisions were not expressly stated in the regulations.

We conclude that §§ 2140.1-2140.3 are valid interpretive rules. As a result, the Plan must satisfy the specific requirements found in these provisions in order to qualify for reimbursement.

## C. The Administrator's decision

Finally, using the reasoning of the Board, Plaintiff contests the district court's decision to affirm the Administrator's decision. The Board reversed UGS's adjustments to VNA's reimbursement, reasoning that the Plan "substantially complied" with the Manual's requirements and any non-compliance of the Plan to the requirements set forth in the Manual was <u>de</u> <u>minimus</u>.

Plaintiff asserts that the strict application of the Manual is inequitable, and that the Board's more relaxed "substantial compliance" approach is proper. Here, we have found the applicable sections of the Manual to be valid interpretive rules implementing the Medicare Act and the Secretary's regulations. The Secretary is charged with administering "a complex and highly technical regulatory program in which the identification and classification of relevant criteria necessarily require significant expertise and the exercise of judgement grounded in policy concerns." Thomas Jefferson Univ., 512 U.S. at 513 (internal citations and quotation marks omitted). Because the manner in which the Manual is implemented is so integral to its operation, it would be odd not to defer to the Secretary's method of applying those rules, as well as those rules themselves. We, therefore, find Plaintiff's objection to the Administrator's "strict application" approach unpersuasive. The district court's ruling affirming the Administrator's decision was correct.

**Affirmed.**

Appendix: Glossary

| Name of Entity or Document | Acronym | Description |
|---|---|---|
| Visiting Nurse Association | VNA | Plaintiff-Appellant in this case |
| Centers for Medicare and Medicaid | CMS | Section of HHS that administers Medicare, and a Defendant-Appellee |
| United Government Services | UGS | The intermediary that performed the initial audit of VNA's deferred compensation plan |
| Provider Reimbursement Review Board | PRRB | Entity that decides appeals of initial reimbursement decisions |
| Deferred Compensation Plan | DCP | The type of employee benefit plan at issue in this case, an arrangement in which a portion of an employee's income is paid out at a date after which that income is actually earned |
| Provider Reimbursement Manual | PRM | Document at issue in this case, containing the Secretary's guidelines for implementing the Medicare Act and regulations, including the requirements a DCP must meet in order to be eligible for reimbursement |