# United States Court of Appeals
## For the First Circuit

No. 07-2673

RHODE ISLAND HOSPITAL,

Plaintiff, Appellee,

v.

MICHAEL O. LEAVITT, in his capacity as Secretary of Health and
Human Services; DEPARTMENT OF HEALTH AND HUMAN SERVICES,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ernest C. Torres, U.S. District Judge]

Before

Torruella, Baldock,* and Howard,
Circuit Judges.

Robert D. Kamenshine, Appellate Section, Civil Division, United States Department of Justice, with whom Gregory G. Katsas, Acting Assistant Attorney General, Robert Clark Corrente, United States Attorney, Scott R. McIntosh, Appellate Section, Civil Division, United States Department of Justice, James C. Stansell, Acting General Counsel, United States Department of Health and Human Services, Nancy S. Nemon, Chief Counsel, Region I, United States Department of Health and Human Services, and Clifford M. Pierce, Assistant Regional Counsel, Region I, United States Department of Health and Human Services, were on brief, for appellant.
Robert G. Flanders, with whom Mitchell R. Edwards, Hinckley, Allen & Snyder LLP, Lawrence W. Vernaglia, and Foley & Lardner LLP were on brief, for appellee.

---

*  Of the Tenth Circuit, sitting by designation.

November 17, 2008

**BALDOCK**, **Circuit Judge**.    Congress established the Medicare program in 1966 to provide health insurance to the elderly and disabled.  See 42 U.S.C. § 1395 et seq.  Part A of that program covers, inter alia, expenses related to inpatient hospitalization. The amount Medicare pays for these services is generally determined under the prospective payment system (PPS).  See Robert Wood Johnson Univ. Hosp. v. Thompson, 297 F.3d 273, 275 (3d Cir. 2002). Under that system, Medicare reimburses healthcare providers according to predetermined rates, which correspond primarily to a patient's diagnosis at discharge.[1]  See Bellevue Hosp. Ctr. v. Leavitt, 443 F.3d 163, 168 (2d Cir. 2006).

Congress recognized, however, that not all inpatient healthcare costs are created equal.  Of particular relevance here, Congress was concerned that teaching hospitals would incur greater costs in treating patients than would non-teaching hospitals.  See H.R. Rep. No. 98-25, part 1, at 140 (1983), as reprinted in 1983

---

[1]    Under the prospective payment system, Medicare does not reimburse healthcare providers according to the costs they actually incur in treating Medicare patients.  See Bellevue Hosp. Ctr., 443 F.3d at 168.  Rather, Medicare payments are based on predetermined rates.  These rates reflect the resources an efficiently run hospital, in the same region, would regularly expend in treating a patient with the same diagnosis at time of discharge.  See Robert Wood Johnson, 297 F.3d at 275-76; Legacy Emanuel Hosp. & Health Ctr. v. Shalala, 97 F.3d 1261, 1262 (9th Cir. 1996); see also 42 C.F.R. § 412.2.  If a hospital treats a given patient for less than that predetermined rate, it reaps a profit.  See Bath Mem'l Hosp. v. Me. Health Care Fin. Comm'n, 853 F.2d 1007, 1011 (1st Cir. 1988).  But if a hospital provides treatment at a higher rate, it incurs a loss.  See id.  Thus, the prospective payment system provides a powerful incentive for providers to maximize the efficiency of their treatment programs.  See Robert Wood Johnson, 297 F.3d at 175.

U.S.C.C.A.N. 219, 359; S. Rep. No. 98-23, at 52 (1983), as reprinted in 1983 U.S.C.C.A.N. 143, 192. To remedy this inequity, Congress established an indirect medical education (IME) adjustment to increase Medicare payments to acute care teaching hospitals. See 42 U.S.C. § 1395ww(d)(5)(B).[2]

The formula Medicare uses to calculate a teaching hospital's IME adjustment is fairly complex. See 42 U.S.C. § 1395ww(d)(5)(B). For our purposes, it is sufficient to say that a teaching hospital's annual IME adjustment is calculated by multiplying the hospital's total PPS payments for the fiscal year by its "teaching adjustment factor." See id. An important variable in the calculation of this "teaching adjustment factor" is a hospital's ratio of full-time equivalent (FTE) residents to its total number of beds.[3] See id.

A hospital's total number of beds appears to serve as a proxy for the size of its medical staff. See County of Los Angeles v. Leavitt, 521 F.3d 1073, 1076 n.2 (9th Cir. 2008) (citing Little Co. of Mary Hosp. and Health Care Ctrs. v. Shalala, 165 F.3d 1162, 1164 (7th Cir. 1999)). The higher a hospital's ratio of FTE residents to staff, the more teaching each individual staff member

---

[2] This case involves Rhode Island Hospital's IME adjustment for the 1996 fiscal year. Both parties agree that we must apply applicable law as it stood in 1996. Accordingly, all citations in this opinion, unless otherwise noted, are to the 1996 version of the United States Code and the Code of Federal Regulations.

[3] For brevity's sake, we use the term "residents" to refer to both interns and residents throughout this opinion.

will be doing.  See id.  Thus, as this ratio increases, so does a hospital's "teaching adjustment factor" and, ultimately, the IME payment a hospital receives from Medicare.  See id. at 1076; see also H.R. Rep. No. 99241, part 1, at 14 (1985), as reprinted in 1986 U.S.C.C.A.N. 579, 592 (noting the increase in a hospital's IME payment "var[ies] directly" with its "ratio of interns and residents to its number of beds").

The issue in this case is whether governing administrative and statutory provisions allow the Secretary of the United States Department of Health and Human Services (the Secretary) to exclude time that residents spend performing research unrelated to patient care from a hospital's FTE count.  See 42 C.F.R. § 412.105(g)(1); 42 U.S.C. § 1395ww(d)(5)(B).  The district court answered this question in the negative and the Secretary appealed.  We have jurisdiction to decide this issue under 12 U.S.C. § 1291.  Because we conclude the Secretary's interpretation of the FTE regulation is permissible, we reverse the ruling of the district court and remand for further proceedings not inconsistent with this opinion.

I.

Rhode Island Hospital (RIH or the hospital) is an acute care facility located in Providence, Rhode Island with a large graduate medical education program.  For the 1996 fiscal year, RIH requested that its fiscal intermediary — a private insurance company Medicare contracts to pay certain bills — include 290 FTEs

in its calculation of the hospital's IME adjustment. Based on its conclusion that governing Medicare regulations precluded counting research time in a hospital's FTE count, the fiscal intermediary reduced RIH's FTE total by 12.06. This exclusion reduced the hospital's IME adjustment by approximately one million dollars.

RIH appealed the fiscal intermediary's decision to the Provider Reimbursement Review Board (PRRB), which is composed of "representative[s] of providers" and other persons "knowledgeable in the field of" provider payments. 42 U.S.C. § 1395oo(h). After a formal hearing, the PRRB reversed the fiscal intermediary's decision. The board concluded the administrative regulation governing a hospital's FTE count (the FTE regulation) was unambiguous and that this regulation did not exclude residents' purely educational research time from a hospital's FTE count. See 42 C.F.R. § 412.105(g)(1).

The Secretary, acting through the Administrator of the Centers for Medicare and Medicaid Services, exercised his right to review the PRRB's decision. See 42 U.S.C. § 1395oo(f)(1). After receiving comments from all interested parties, the Secretary determined that the IME payment made by Medicare was only intended, and had historically only been used, to reimburse teaching hospitals for increased patient care costs. The Secretary also concluded that residents performing educational research were not assigned to an eligible area of the hospital under the governing FTE regulation. Accordingly, the Secretary ruled that the time

-6-

residents spend performing research unrelated to patient care could not contribute to a teaching hospital's total number of FTEs.

RIH appealed the Secretary's decision to the United States District Court for the District of Rhode Island. See id. Ultimately, both RIH and the Secretary moved for summary judgment. In granting RIH's motion and denying that of the Secretary, the district court concluded the Secretary had misread the plain language of the governing FTE regulation. See 42 C.F.R. § 412.105(g)(1). The district court also made an alternative holding that even if the Secretary's reading of the FTE regulation was reasonable in the abstract, such a reading was unreasonable in light of Congress's purpose in establishing the IME adjustment. On appeal, the Secretary contests both of these conclusions.

II.

Our review of a district court's summary judgment ruling is de novo. See Visiting Nurse Ass'n Gregoria Auffant, Inc. v. Thompson, 447 F.3d 68, 72 (1st Cir. 2006). We thus apply the same legal standards that pertain in the district court, affording no particular deference to that court's decision. See id. The strictures of the Administrative Procedure Act (APA) govern judicial review of the Secretary's reimbursement determination. See 42 U.S.C. § 1395oo(f)(1); see also Visiting Nurses Ass'n, 447 F.3d at 72. Accordingly, our review of the Secretary's ruling is conducted through the narrow lens of a colored glass. See Visiting

-7-

Nurses Ass'n, 447 F.3d at 72; Strickland v. Comm'r, 48 F.3d 12, 16 (1st Cir. 1995).

Under the APA, agency action is presumptively valid and we may only overturn an agency decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." See Visiting Nurse Ass'n, 447 F.3d at 72 (quoting 5 U.S.C. § 706(2)(A)). This standard precludes a reviewing court from substituting its own judgment for that of the agency. See Carcieri v. Kempthorne, 497 F.3d 15, 43 (1st Cir. 2007). Of course, we will not uphold an administrative decision contrary to the "unambiguously expressed intent of Congress." Strickland, 48 F.3d at 16. "If the intent of Congress is clear, that is the end of the matter . . . ." Id. But in many cases no "unmistakably clear expression of congressional intent" exists. Id. at 17; see also United States v. Councilman, 418 F.3d 67, 88 (1st Cir. 2005) (noting that legislative history is "often murky, ambiguous, and contradictory" (quoting Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 568 (2005))).

In these circumstances, courts defer to the views of the agency Congress has entrusted with relevant rule-making authority, affording "considerable deference" to the agency's interpretation of regulations promulgated under that authority. Royal Siam Corp. v. Chertoff, 484 F.3d 139, 145 (1st Cir. 2007). Judicial deference is further magnified in cases involving "complex and highly technical" administrative programs, such as Medicare. Visiting

Nurse Ass'n, 447 F.3d at 76; see also Stowell v. Sec'y of Health & Human Servs., 3 F.3d 539, 544 (1st Cir. 1993) ("Courts should not cavalierly discount the value of agency expertise painstakingly garnered in the administration, over time, of [administrative] programs of remarkable intricacy."). To receive this deference, the agency need not "write a rule that serves the statute in the best or most logical manner; it need only write a rule that flows rationally from a permissible construction of the statute." Strickland, 48 F.3d at 17.

Judicial review under the APA thus consists of establishing "parameters of rationality within which the agency must operate." South Terminal Corp. v. EPA, 504 F.2d 646, 665 (1st Cir. 1974). So long as an agency's decision is rational and based on regulations promulgated after all the requisite "procedural corners" have been "squarely turned," we will uphold that decision provided it does "not collide directly with substantive statutory commands." Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Comm'n, 59 F.3d 285, 290 (1st Cir. 1995). We abstain from this deferential approach only when the agency's interpretation of its regulation is "plainly erroneous or inconsistent with its language." Visiting Nurse Ass'n, 447 F.3d at 72.

III.

At issue in this case is the Secretary's reading of 42 C.F.R. § 412.105(g)(1), which sets forth the type of resident

activities Medicare will include in its calculation of a teaching hospital's FTE count. This regulation contains two basic requirements. First, a resident must "be enrolled in an approved teaching program." 42 C.F.R. § 412.105(g)(1)(i). Second, a resident must "be assigned to one of the following areas:" (1) the "portion of the hospital subject to the prospective payment system," (2) the "outpatient department of the hospital," or (3) certain entities under the "ownership or control of the hospital," if the hospital incurs "all, or substantially all, of the costs of the services furnished by those residents." Id. § 412.105(g)(ii). The regulation also provides that FTE status "is based on the total time necessary to fill a residency slot." Id. § 412.105(g)(1)(iii). Medicare counts a resident "working" in an ineligible "area" of the hospital as a partial FTE "based on the proportion of time" he or she is "assigned" to an eligible "area" of the hospital. Id. § 412.105(g)(1).

The Secretary does not dispute that all of the residents for which RIH requested FTE credit are enrolled in an approved teaching program. Rather, the Secretary contends that residents assigned to perform educational research, i.e. research unrelated to patient care, are, by definition, not "assigned" to an "area" or "portion of the hospital subject to the prospective payment system." Id. § 412.105(g)(1)(ii). This reading of the FTE regulation has a certain appeal.

-10-

Medicare utilizes the prospective payment system to pay hospitals "for operating costs for inpatient hospital services." 42 C.F.R. § 412.6(a)(1). Although purely educational research results in additional "operating costs" for teaching hospitals, those costs are not directly related to "inpatient hospital services." Id. As if to make this distinction clear, Congress specifically excluded the "costs of approved educational activities" from its definition of the "operating costs of inpatient hospital services" that are reimbursable by Medicare. 42 U.S.C. § 1395ww(a)(4).

The hospital responds that the FTE regulation does not require that the work a resident performs be reimbursable under the prospective payment system. Instead, the regulation mandates that a resident "be assigned" to an "area" or "portion" of the hospital that is subject to the prospective payment system. Reading this language in geographic terms, RIH argues the words "area" and "portion" simply refer to all units of a hospital complex not specifically excluded from PPS billing. See American Heritage Dictionary (4th ed. 2006)(defining "area" as a "roughly bounded part of the space on a surface; a region"); id. (defining "portion" as a "section or quantity within a larger thing; a part of a whole");[4] see also Robert Wood Johnson, 297 F.3d at 275

---

[4] "Dictionaries of the English language are a fundamental tool in ascertaining the plain meaning of terms used in statutes and regulations." United States v. Lachman, 387 F.3d 42, 51 (1st Cir. 2004).

(recognizing that Medicare pays for most inpatient services through the prospective payment system).

Under the hospital's view, the nature of a resident's work is immaterial. As long as a resident is assigned to an area of the hospital not specifically excluded from PPS billing, that resident's work counts towards a hospital's total number of FTEs.[5] See Webster's Revised Unabridged Dictionary (1996) (defining "assign" as to "to allot; to apportion"); see also 42 C.F.R. § 412.25 (addressing hospital units, such as psychiatric and rehabilitation units, excluded from PPS billing). The Secretary concedes that the hospital's interpretation of the FTE regulation is plausible. At the same time, the Secretary offers a functional reading of the regulation's text, which supports his decision to exclude residents' purely educational research time from the hospital's FTE count.

A cursory review of a dictionary reveals that "assign" and "area" often have a functional connotation. See American Heritage Dictionary (4th ed. 2006) (defining "assign" as to "set apart for a particular purpose," "select for a duty," or to "give out as a task"); id. (defining "area" as a "distinct part or section, as of a building, set aside for a specific function," or a "division of experience, activity, or knowledge"). Accordingly,

---

[5] These excluded units continued to bill Medicare under the old reasonable cost system. Under this system, a unit's IME costs are automatically factored into the payments it receives from Medicare. See infra Part IV (describing the reasonable cost billing system).

-12-

the Secretary suggests that to be "assigned" to a "portion" of the hospital subject to the prospective payment system a resident must be integrated into a hospital unit dedicated to a form of patient care subject to PPS billing.[6]  See Webster's Revised Unabridged Dictionary (1996) (defining "portion" as a "part considered by itself, though not actually cut off or separated from the whole").

The residents at issue in this case were "assigned" to a research rotation during which they conducted purely educational research, presumably in a lab.  As such, they were not integrated into a unit of the hospital dedicated to patient care services that are reimbursable under the prospective payment system. Accordingly, the Secretary maintains the hours these residents engaged in purely educational research do not count towards RIH's total number of FTEs.

In light of the various definitions of 42 C.F.R. § 412.105(g)(1)(ii)'s key terms, neither party's interpretation of the FTE regulation is completely beyond the pale.[7]  Because the FTE

_____

[6]    The fact that Medicare's PPS billing applies only to inpatient (i.e., patient care) services may reasonably be read into the FTE regulation's language regarding the prospective payment system.  See 42 C.F.R. § 412.6(a)(1); id. § 412.105(g)(1)(ii)(A). Accordingly, if one adopts a functional definition of the FTE regulation's key terms, one may fairly read that provision as incorporating a patient care requirement.  The hospital's assertion that a patient care requirement is unsupported by the FTE regulation's text is thus without merit.

[7]    We recognize that other courts have reached the opposite conclusion.  See Univ. Med. Ctr. Corp. v. Leavitt, No. 05-495, 2007 WL 891195, at *2 (D. Ariz. Mar. 21, 2007) (unpublished); Riverside Methodist Hosp. v. Thompson, No. C2-02-94, 2003 WL 22658129, at *6 (S.D. Ohio July 31, 2003) (unpublished).  For the reasons explained

-13-

regulation's language "admits of more than one reasonable interpretation," it is ambiguous. Gen. Motors Corp. v. Darling's, 444 F.3d 98, 108 (1st Cir. 2006); see also South Shore Hosp., Inc. v. Thompson, 308 F.3d 91, 100 (1st Cir. 2002) (refusing to ignore the "patent ambiguity" of a regulatory provision). We give effect to an agency's interpretation of its own ambiguous regulation so long as that interpretation is reasonable. See Visiting Nurse Ass'n, 447 F.3d at 72-73. To be reasonable, an agency's reading of a regulatory provision must sensibly conform to that regulation's wording and purpose. See id.

In this case, we cannot say the Secretary's interpretation of the FTE regulation is unnatural or strained. Hospitals are routinely divided along functional lines. Even a layperson is readily familiar with, for example, a hospital's cardiac unit or its psychiatric ward. See Onujiogu v. United States, 817 F.2d 3, 5 (1st Cir. 1987) (noting that "the law is not so struthious as to require courts to ignore the obvious"). These areas or portions of the hospital are defined by the services, or types of patient care, they provide. Thus, the Secretary's functional reading of the FTE regulation is entirely plausible.[8]

above, we disagree with their holding that only one reasonable interpretation of the FTE regulation exists.

[8] Acute care hospitals are facilities dedicated to providing inpatient care. One could logically assume that residents assigned to such hospitals are engaged in patient-care activities. Ostensibly, this is one reason why Congress did not include an explicit patient-care requirement when it established an IME adjustment for acute care hospitals, but imposed such an explicit

-14-

Our conclusion is not altered by the FTE regulation's additional requirement that a resident "be enrolled in an approved teaching program." 42 C.F.R. § 412.105(g)(1)(i); see also Skidgel v. Me. Dep't of Human Servs., 994 F.2d 930, 937 (1st Cir. 1993) (recognizing that to determine the meaning of a provision courts examine its "context" to ascertain that provision's place in the greater legal "scheme"). As part of RIH's approved educational program, residents must perform scholarly research. The hospital suggests that it would be anomalous for the FTE regulation to specifically require a resident be enrolled in an approved teaching program, and then exclude research time required by that program from a hospital's FTE count.

All the text of § 412.105(g)(1)(i) indicates, however, is that Medicare does not wish to include residents registered in unapproved, and thus untested, educational programs in a hospital's FTE count. Certainly nothing in that section mandates the Secretary read every element of the FTE regulation in the light most favorable to a hospital's approved teaching programs. While such an interpretation may, or may not, be desirable as a matter of public policy, "policy choices" are generally "for the agency, not the court[s], to make." Associated Fisheries of Me., Inc. v.

––––––––––––––––––––

requirement when it later extended the adjustment to non-hospital settings. Compare 42 U.S.C. § 1395ww(d)(5)(B) (2008), with 42 U.S.C. § 1395ww(d)(5)(B)(iv) (2008). Residents assigned to non-hospital settings, i.e., settings not exclusively dedicated to patient-care activities, are, by default, more likely to engage in activities unrelated to the care of patients.

-15-

Daley, 127 F.3d 104, 109 (1st Cir. 1997); see also Strickland, 48 F.3d at 17 (explaining the agency need not adopt the "best" rule, only a rational one).

The hospital has also failed to demonstrate that adhering to the Secretary's reading of 42 C.F.R. § 412.105(g)(1) would necessarily lead to absurd results. See Dantran, Inc. v. U.S. Dep't of Labor, 171 F.3d 58, 65 (1st Cir. 1999) (acknowledging that courts are reluctant to adhere to an agency's reading of a regulation when that reading would "lead to absurd results"). For example, the hospital claims the Secretary's interpretation of the FTE regulation would render a department subject to the prospective payment system one minute, i.e. when a resident is engaged in patient care, and not subject to the prospective payment system the next, i.e. when a resident is engaged in educational research. We are not presented, however, with a factual scenario in which residents routinely performed purely educational research while assigned to patient care units, and no evidence exists in the record that this is often the case. To the contrary, the record reflects that the residents at issue here were assigned to a research rotation, the purpose of which is to provide residents a concentrated period of time to conduct scholarly research. See, e.g., Joint Appendix (App.) at 860-70. Thus, the hypothetical problem posed by the hospital is inapposite. See United States v. Dickerson, 514 F.3d 60, 65 (1st Cir. 2008) (noting that counsel

-16-

must "present the court with something more than hypotheticals with no support in the record").

The hospital also argues that under the Secretary's interpretation of the FTE regulation no resident would ever qualify as a full FTE because all residents are required to participate in activities, such as educational research and attending classes, which are unrelated to patient care.[9] What the hospital fails to mention is that a hospital's Director of Graduate Medical Education, not Medicare, is the party empowered with determining the "total time necessary to fill a residency slot." See 42 C.F.R. § 412.105(g)(1)(iii); App. at 10. Presumably, the director could limit this calculation to the number of work hours required to fill a single resident position on a hospital's staffing calendar.[10] See Merriam-Webster Dictionary (2008) (defining "slot" as "an assignment or job opening; position").

_____

[9] The hospital's quarrel in this regard reflects more of a dissatisfaction with the use of the FTE count in determining a hospital's IME adjustment than it does any pressing controversy over the Secretary's means of determining a hospital's number of FTEs. Commentators, as early as 1984, voiced similar concerns. 49 Fed. Reg. 234, 268 (Jan. 3, 1984). For instance, commentators noted that residents "are students and not employees" and suggested Medicare count them "on the basis of 'assigned time' rather than on the basis of full-time employee status," as they believed "payroll status [was] not an accurate determinant of the number of . . . residents actually working at [a] hospital." Id.

[10] Indeed, the record suggests the hospital may have limited its calculation of the total time necessary to fill a residency slot in some manner. See App. at 1034 (explaining that RIH's Director of Medical Education, Dr. John Murphy, testified residents worked 70-75 hours per week, but a study conducted by the hospital, in advance of the present suit, indicated residents worked only 50 hours per week).

-17-

As far as educational research is concerned, the record does not suggest that a resident is assigned to a research rotation at regular intervals. See, e.g., App. at 25 (mandating that each resident demonstrate "some form of acceptable scholarly activity" before the "completion" of his or her training); id. at 58 ("The curriculum should include resident experience in scholarly activity prior to completion of the program."). Hypothetically, Medicare could, for example, reasonably refuse to count an otherwise "full time resident" as an FTE during the year in which she fulfilled her mandatory scholarly research requirement. That resident would then qualify as an FTE for the remaining term of her residency, as her work would help to satisfy a hospital's regular staffing requirements. We cannot say that such an arrangement would render the Secretary's interpretation of the FTE regulation anomalous.[11]

In sum, 42 C.F.R. § 412.105(g)(1)(ii) is ambiguous. The Secretary's reading of that regulation is not plainly erroneous or inconsistent with its language. See Visiting Nurse Ass'n, 447 F.3d at 72. Consequently, we will defer to the Secretary's interpretation of the FTE regulation unless that interpretation conflicts with substantive statutory commands or the FTE

---

[11] To be clear, the purpose of the examples we have given is not to proclaim their accuracy. These hypotheticals merely demonstrate the hospital's failure to show that applying the Secretary's reading of the FTE regulation would necessarily lead to absurd results. See Visiting Nurse Ass'n, 447 F.3d at 72 (noting that, under the APA, courts presume the validity of agency action).

regulation's underlying purpose.[12]  See id. at 72-73; Citizens Awareness Network, Inc., 59 F.3d at 290; see also La Casa Del Convaleciente v. Sullivan, 965 F.2d 1175, 1178 (1st Cir. 1992) ("Deference is particularly appropriate in an area that is as complex as the field of Medicare reimbursement.").

IV.

We now turn to the statutory basis for the FTE regulation at issue.  See 42 U.S.C. § 1395ww(d)(5)(B).  To cogently discuss the relevant subsection, we must first examine the IME adjustment's history and the means by which the Secretary previously reimbursed Medicare providers.  In general, that entails a discussion of the reasonable cost billing system, which governed provider payments at Medicare's inception.

Under the reasonable cost system, Medicare paid hospitals the "reasonable cost," 42 U.S.C. § 1395f(b)(1), of "inpatient hospital services."  Id. § 1395d(a)(1).  Medicare considered a hospital's "reasonable cost" to be the cost the hospital "actually

---

[12]  The hospital also asserts the Secretary's functional interpretation of the FTE regulation is merely a "litigation position" to which we should not accord deference. See Alliance to Protect Nantucket Sound, Inc. v. U.S. Dep't of Army, 398 F.3d 105, 112 n.5 (1st Cir. 2005) (noting that "deference is not due to interpretations that are post hoc rationalizations offered by an agency seeking to defend past agency action against attack"). What the hospital fails to appreciate is that the Secretary's interpretation of his own regulations in an "administrative adjudication" is "agency action, not a post hoc rationalization of it." Fed. Labor Relations Auth. v. U.S. Dep't of Navy, 941 F.2d 49, 59 (1st Cir. 1991). No indication exists that the Secretary "forfeited [his] entitlement to deference here." Royal Siam Corp., 484 F.3d at 146.

incurred," minus any portion of that cost it deemed "unnecessary in the efficient delivery of needed health services." Id. § 1395x(v)(1)(A). Because medicare payments were predicated on a hospital's actual expenditures, the reasonable cost system automatically reimbursed teaching hospitals for IME costs related to their teaching programs. See id.; 48 Fed. Reg. 39,752, 39,778 (Sept. 1, 1983) (noting that "reasonable cost" payments "already include the indirect costs of medical education").

Government costs under the pure reasonable cost system, however, were inordinately high. To save money, Congress authorized the Secretary to place "limits" on providers' reimbursements. See 42 U.S.C. § 1395x(v)(1)(A); see also 42 C.F.R. § 413.30. These limits reflected Medicare's estimate of what a provider should spend "in the efficient delivery of needed health services." 42 U.S.C. § 1395x(v)(1)(A). The Secretary promulgated these cost limits, otherwise known as section 223 limits, in the Federal Register. See generally 46 Fed. Reg. 48,010 (Sept. 30, 1981); 45 Fed. Reg. 41,868 (June 20, 1980).

Medicare's new reasonable cost limits failed to take into account, however, the indirect costs of hospitals' teaching programs. See 45 Fed. Reg. 21,582, 21,584 (April 1, 1980). Consequently, the Secretary established an "automatic adjustment" to account specifically for teaching hospitals' increased "general inpatient routine operating costs." Id. This adjustment depended

-20-

on the level of a hospital's "teaching activity."[13]  Id.  The greater a hospital's teaching activity, the greater the increase in that hospital's reasonable cost limits.  See id.  Much like the present system, a hospital's level of "teaching activity" depended, in large part, upon the ratio of its FTE residents to beds.  See id.  Under the modified reasonable cost system, however, Medicare measured a teaching hospitals total number of FTEs simply by determining the number of eligible residents employed at the hospital on a prescribed date.  See 47 Fed. Reg. 43,296, 43,310 (Sept. 30, 1982); 46 Fed. Reg. 48,010, 48,013 (Sept. 30, 1981); 45 Fed. Reg. 21,582, 21,584 (April 1, 1980).

In 1983, Congress passed legislation establishing the prospective payment system for Medicare reimbursement, which largely displaced reasonable cost billing.  See Social Security Amendments of 1983, Pub. L. No. 98-21, § 601, 97 Stat. 65, 149 (1983); see also supra note 1 and accompanying text (describing the prospective payment system). As part of that legislation, Congress statutorily adopted the IME adjustment, which the Secretary created years earlier.  The relevant portion of the statute reads:  "The Secretary shall provide for an additional payment amount for [acute care hospitals] with indirect costs of medical education, in an amount computed in the same manner as the adjustment for such costs

---

[13]  The Secretary's statistical analysis demonstrated "a high degree of correlation between a hospital's level of general inpatient routine operating costs and the extent of its teaching activity."  45 Fed. Reg. 21,582, 21,584 (April 1, 1980); see also 47 Fed. Reg. 43,296, 43,302 (Sept. 30, 1982).

under regulations (in effect as of January 1, 1983) under subsection (a)(2) of this section . . . ."[14]  42 U.S.C. § 1395ww(d)(5)(B).

Under the modified reasonable cost system, the Secretary instituted the IME adjustment through notices published in the Federal Register.  None of these notices appeared, however, in the Code of Federal Regulations.  Therefore, we are immediately faced with an ambiguity in the statute's text.  See id.

A "regulation" is often defined as a generally applicable statement that has the legal effect of binding an agency or other parties.  See,e.g., Kennecott Utah Copper Corp. v. U.S. Dep't of Interior, 88 F.3d 1191, 1207 (D.C. Cir. 1996).  By law, the Director of the Federal Register is required to publish each federal regulation of "general applicability and legal effect" in the Code of Federal Regulations.  1 C.F.R. § 8.1 (2008); see also 44 U.S.C. § 1510 (defining the "Code of Federal Regulations" as a "complete codification[] of the documents of each agency of the Government having general applicability and legal effect").  Because the IME provisions the Secretary promulgated under the modified reasonable cost system were not included in the Code of Federal Regulations, the Secretary now suggests no "regulations"

_____

[14]  Subsection (a)(2) gives the Secretary the authority to create exemptions, exceptions, and adjustments to the cost limits Congress mandated in subsection (a)(1).  See 42 U.S.C. § 1395ww(a)(2).

were in effect, under subsection (a)(2), as of January 1, 1983. See 42 U.S.C. § 1395ww(d)(5)(B).

We need not speculate in this regard. The statute's legislative history makes clear that Congress intended to create an adjustment similar to the one the Secretary applied under the modified reasonable cost system.[15] As such, the "regulations" Congress had in mind were clearly those the Secretary published in the Federal Register.[16] The statutory IME provision thus instructs the Secretary to "compute[]" a teaching hospital's IME adjustment "in the same manner" as the Secretary calculated that adjustment in January 1, 1983, with certain delineated exceptions. 42 U.S.C. § 1395ww(d)(5)(B).

The hospital takes a broad view of the statutory language. Indeed, it suggests the Secretary is statutorily required to determine the FTE variable in the IME calculus in the

---

[15] See H.R. Rep. No. 98-25, pt. 1, at 140 (1983), as reprinted in 1983 U.S.C.C.A.N. 219, 359 (stating that, "with respect to" IME expenses, the Social Security Amendments of 1983 would provide an adjustment "equal to twice the teaching adjustment" applied under the modified reasonable cost system); see also S. Rep. No. 98-23, at 52 (1983), as reprinted in 1983 U.S.C.C.A.N. 143, 192 (noting that the Social Security Amendments of 1983 provide for an adjustment "equal to twice the adjustment used in connection with" the modified reasonable cost system).

[16] The hospital cites the principle that "a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency." Kurzon v. U.S. Postal Serv., 539 F.2d 788, 792 (1st Cir. 1976) (quoting SEC v. Chenery Corp., 332 U.S. 194, 196 (1947)). We simply note that statutory interpretation does not fall within the category of decision-making that an "agency alone is authorized to make." Id.

same manner the Secretary computed that variable in January 1983. Our reading of the statute's text and its legislative history, however, leads us to adopt a narrower view. See United States v. Charter Int'l Oil Co., 83 F.3d 510, 517 (1st Cir. 1996) (noting that "where the statute is ambiguous, legislative history may be considered" (citing Lomas Mortgage, Inc. v. Louis, 82 F.3d 1, 4 (1st Cir. 1996))).

The portion of the statute on which the hospital focuses its gaze is the introductory paragraph of a subsection that revises the formula the Secretary used to calculate a hospital's IME adjustment under the modified reasonable cost system. See 42 U.S.C. § 1395ww(d)(5)(B). Congress' prefatory instruction regarding the computation of the IME adjustment merely directs the Secretary, as a general matter, to calculate a hospital's IME adjustment using the formula instituted under the modified reasonable cost system. See Oxford English Dictionary (2008) (defining "compute" as to "determine by . . . mathematical reckoning, or "to ascertain by a relatively complex calculation"). Where Congress wished to modify that formula, it laid out a specific exception to this general rule. See, e.g., 42 U.S.C. § 1395ww(d)(5)(B)(ii) (2008).

The legislative history of 42 U.S.C. § 1395ww(d)(5)(B) supports this reading of the statute's text. Congress' main purpose in addressing the IME adjustment was to increase Medicare's

payments to teaching hospitals.[17]  To effect its will, Congress altered certain determinate aspects of the formula the Secretary used to calculate a hospital's IME payment.[18]  See supra note 15 (explaining that Congress simply intended the statutory IME formula to double the value of the teaching adjustment the Secretary used under the modified reasonable cost system); see also 51 Fed. Reg. 6,755, 6,755 (Feb. 26, 1986) (same); 48 Fed. Reg. 39,752, 39,778 (Sept. 1, 1983) (same).

Nothing in the IME adjustment's legislative history, however, suggests Congress wished to abrogate the Secretary's authority to regulate the proper calculation of an indeterminate variable, such as a hospital's ratio of FTEs to beds, in the IME equation.[19]  Indeed, no indication exists that Congress even

---

[17]  See supra note 15.  Congress eventually determined that this adjustment was too generous, in that it overestimated teaching hospitals additional costs in providing inpatient care.  See H.R. Rep. 99-241, part 1, at 14-15 (1985), as reprinted in 1986 U.S.C.C.A.N. 579, 592-93.  Accordingly, Congress reduced the level of the adjustment, thereby saving the federal government $2.9 billion over a three year period.  See id.

[18]  Congress did not choose to alter the indeterminate variable in the Secretary's established IME formula reflecting "the ratio of [a] hospital's full-time equivalent interns and residents to [its] beds."  42 U.S.C. § 1395ww(d)(5)(B)(ii); 47 Fed. Reg. 43296, 43,310 (Sept. 30, 1982); see also 42 U.S.C. § 1395ww(d)(5)(B) (approving, as a general matter, the formula the Secretary previously used to calculate the IME adjustment).

[19]  We reject RIH's contention that the legislative history of the Comprehensive Omnibus Budget Reconciliation Act of 1986 supports its restrictive reading of 42 U.S.C. § 1395ww(d)(5)(B) for much the same reasons we rejected the hospital's reading of the statute.  In lowering the value of the IME teaching adjustment factor, Congress stated in a House Report:  "The Committee has stated the specific indirect teaching adjustment formula in the

considered the nuances involved in determining the FTE eligibility of residents in teaching hospitals in which two very different Medicare payment systems are in play. When faced with an "interpretive issue" of "minor general significance" involving a "highly technical and complex" statutory provision, we presume "Congress would have wanted the agency to enjoy a degree of legal leeway in specifying" that provision's "scope." Evans v. Comm'r, 933 F.2d 1, 7 (1st Cir. 1991). Accordingly, we reject the hospital's restrictive reading of the statutory text and hold that Congress has not "directly spoken to the precise question at issue" here. Carcieri, 497 F.3d at 26.

                                V.

We have concluded the Secretary's reading of the FTE regulation is permissible and that this regulation does not fly in the face of substantive statutory commands. Still, the hospital argues the Secretary's interpretation of his FTE regulation is counter to congressional policy underlying the statutory provision

---

law. There is no discretion on the part of the Secretary." H.R. Rep. 99-241, part 1, at 15 (1985), as reprinted in 1986 U.S.C.C.A.N. 579, 593. The hospital emphasizes the latter sentence to the exclusion of the first in arguing the Secretary has no authority to change the means by which Medicare determines a hospital's FTE count. But here again, Congress merely stated that the Secretary may not alter the IME "formula" Congress established, thus frustrating congressional efforts to lower hospitals' IME payments. Nothing in this language suggests Congress wished to remove the Secretary's authority to determine the proper calculation of an indeterminate variable, such as a hospital's ratio of FTE residents to beds, in the statutory equation. Although Congress had many opportunities to do so, it has "not seen fit to question" this longstanding "administrative practice." Silverman v. Rogers, 437 F.2d 102, 107 (1st Cir. 1970).

for an IME payment, as well as the administrative rationale for establishing the FTE regulation in the first place. See FEC v. Democratic Senatorial Campaign Comm., 454 U.S. 27, 32 (1981) (instructing lower courts to reject agency interpretations that "frustrate the policy . . . Congress sought to implement"); Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) (noting that courts will not defer to the Secretary's interpretation where "an alternative reading is compelled . . . by other indications of the Secretary's intent at the time of the regulation's promulgation"). Accordingly, we proceed to examine the purpose of the IME adjustment and the FTE regulation at issue.

Congress "specifically excluded" the "direct and indirect expenses associated with medical education activities" from reimbursement under the new "prospective payment system."[20] H.R. Rep. No. 98-25, pt. 1, at 140 (1983), as reprinted in 1983 U.S.C.C.A.N. 219, 359. At the same time, Congress mandated that the Secretary continue to provide an IME adjustment to reimburse teaching hospitals for the "indirect costs" of their "medical education" programs. H.R. Rep. 99-241, pt. 1, at 14 (1985), as reprinted in 1986 U.S.C.C.A.N. 579, 592. The hospital correctly

---

[20] Medicare continued to reimburse hospitals' direct medical education expenses, such as "salaries for residents and teachers and classroom costs," on a reasonable cost basis. H.R. Rep. 99-241, pt. 1, at 14 (1985), as reprinted in 1986 U.S.C.C.A.N. 579, 592; see also H.R. Rep. No. 98-25, pt. 1, at 140 (1983), as reprinted in 1983 U.S.C.C.A.N. 219, 359; 48 Fed. Reg. 39,752, 39,762 (Sept. 1, 1983) (noting that Medicare would "continue" to pay direct medical education costs "on a reasonable cost basis").

notes that Congress viewed a hospital's ratio of FTE residents to beds as a "proxy" or means of estimating various "factors" that "legitimately increase" teaching hospitals' costs.[21]  H.R. Rep. No. 98-25, pt. 1, at 140-41 (1983), as reprinted in 1983 U.S.C.C.A.N. 219, 359-60; S. Rep. No. 98-23, 52 (1983), as reprinted in 1983 U.S.C.C.A.N. 143, 192; see also Oxford English Dictionary (2008) (defining "proxy" as a "variable that can be used as an indirect estimate of another variable with which it is correlated").  But this fact alone, contrary to the hospital's assertions, tells us nothing about the type of resident activities Congress desired the Secretary to include in his calculation of the FTE variable.

The IME adjustment's legislative and administrative history, however, indicates the adjustment was intended to reimburse hospitals for the "increased patient care costs associated with [their] teaching programs due to such factors as increased diagnostic testing, increased numbers of procedures prescribed, higher staffing ratios and a more severely ill patient population."[22]  H.R. Rep. No. 99-241, part 1, at 14 (1985), as

---

[21]  A teaching hospital's IME costs are "defined in terms of increased operating costs."  51 Fed. Reg. 6,755, 6,755 (Feb. 26, 1986).  These added costs "are not separately identifiable" on a hospital's "cost report" or other "accounting records."  Id.  Consequently, Medicare estimates this "incremental" increase in operating costs by calculating a hospital's level of "teaching intensity."  Id.  The ratio of a hospital's FTE residents to beds is the "proxy" Medicare uses "to measure teaching intensity."  Id.

[22]  See also H.R. Rep. No. 103-601, pt. 4 (1994), 1994 WL 410617 (suggesting Congress wished VA teaching hospitals to receive the IME adjustment accorded to other teaching hospitals in light of "the increased intensity, complexity and, therefore, cost, of

-28-

reprinted in 1986 U.S.C.C.A.N. 579, 592 (emphasis added); 51 Fed. Reg. 16,772, 16,775 (May 6, 1986) (adding "more detailed medical records" to this list); see also 51 Fed. Reg. 16,772, 16,775 (May 6, 1986) (noting that Congress established an IME adjustment computed "in the same manner as the adjustment for those costs under regulations in effect as of January 1, 1983" and that "[u]nder those regulations" IME costs were "the increased operating costs (that is, patient care costs)" associated with hospitals' approved teaching programs) (emphasis added). Educational research expenses do not directly increase the costs teaching hospitals incur in providing patient care. As a result, we cannot say the Secretary's reading of the FTE regulation frustrates the policies Congress sought to implement.

Nor do we conclude the original purpose of the FTE regulation is at odds with the Secretary's current reading of that

---

caring for [these hospitals'] patients"); Richard S. Schweiker, Report to Congress: Hospital Prospective Payment for Medicare 48 (December 1982) (stating that IME costs "are higher patient care costs incurred by hospitals with medical education programs" and noting that the Secretary had developed "an adjustment methodology" to reimburse "teaching hospitals" for their "higher patient care costs"); 54 Fed. Reg. 40,286, 40,286 (Sept. 29, 1989) (noting that hospitals with IME costs receive an additional Medicare payment and explaining that "'indirect costs of medical education' means those additional operating (that is, patient care) costs incurred by hospitals" with teaching programs); 51 Fed. Reg. 6,755, 6,755 (Feb. 26, 1986) ("The indirect costs of medical education are increased operating costs, that is, patient care costs, associated with teaching programs."); 45 Fed. Reg. 41,868, 41,869 (June 20, 1980) (establishing an "automatic upward adjustment" to teaching hospitals' cost limits as these hospitals experienced added "inpatient general routine operating costs generated by [their] approved internship and residency programs").

provision. The requirement that a resident be assigned to an area of a teaching hospital subject to the prospective payment system is predicated on the fact that certain hospital units continued to bill Medicare under the reasonable cost system. See 48 Fed. Reg. 39,752, 39,778 (Sept. 1, 1983). Under the reasonable cost system, Medicare automatically reimbursed teaching hospitals for their IME expenses. See id. at 39,754 (noting that "reasonable costs include all . . . indirect costs that are necessary and proper for the efficient delivery of needed health services"). To avoid paying the IME adjustment twice, the Secretary was required to exclude residents assigned to non-PPS billing (i.e., reasonable cost billing) units from a hospital's FTE count. See id. at 39,778 (explaining that the IME adjustment "does not apply" to hospital units that bill Medicare under the "reasonable cost" system because Medicare's "payments to those facilities already include" a hospital's IME costs).

Because residents assigned to a research rotation are not assigned to a reasonable cost billing unit, the hospital argues their work must count towards a hospital's total number of FTEs. We think the scope of the Secretary's intent in establishing the FTE regulation should be read more broadly. At base, the Secretary was not concerned merely with whether a resident was assigned to a reasonable cost billing unit. The purpose of the FTE regulation was, instead, to exclude residents from a hospital's FTE count who did not contribute to the added costs, which the IME adjustment was

intended to reimburse.  As we have already explained, the IME adjustment's legislative and administrative history adequately support the Secretary's conclusion that this provision was intended to compensate teaching hospitals for added costs of patient care unremunerated by the prospective payment system.  The Secretary's current reading of the FTE regulation is consistent with that intent.

Put simply, the Secretary's interpretation of the FTE regulation is not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A). We therefore "refuse to substitute our judgment" for that of the Secretary.  Natural Res. Def. Council, Inc. v. U.S. E.P.A., 824 F.2d 1258, 1293 (1st Cir. 1987); South Shore Hosp., Inc., 308 F.3d at 97 (noting that our review, under the APA, is "tightly circumscribe[d]").  For the above-stated reasons, we reverse the ruling of the district court and remand for further proceedings not inconsistent with this opinion.[23]

---

[23]  In the district court, RIH made an alternative argument that some of its residents' research time was related to the treatment or diagnosis of particular patients.  Thus, even under the Secretary's reading of the FTE regulation, the hospital maintains this research time should count towards its total number of FTEs.  Because the district court did not reach this claim and the hospital failed to raise it on appeal, we express no opinion as to its merits.  See In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.), 348 F.3d 16, 21 n.4 (1st Cir. 2003).