# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 09-3429

THE UNIVERSITY OF CHICAGO MEDICAL CENTER,
d/b/a University of Chicago Hospitals & Clinics,

*Plaintiff-Appellee*,

*v.*

KATHLEEN SEBELIUS, Secretary of Health and
Human Services,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 CV 7016—**Wayne R. Andersen**, *Judge.*

ARGUED FEBRUARY 25, 2010—DECIDED AUGUST 25, 2010

Before CUDAHY, EVANS, and SYKES, *Circuit Judges.*

CUDAHY, *Circuit Judge.* This appeal involves a question of regulatory and statutory interpretation affecting whether the University of Chicago Medical Center (hospital) is entitled to approximately $2.8 million in Medicare reimbursements for indirect medical education (IME)

expenses. One factor in a hospital's IME reimbursement is the hospital's count of its full-time equivalent residents (FTEs). Here, the hospital claimed an FTE total for the 1996 fiscal year that reflected the time medical residents spent conducting educational research unrelated to the care of Medicare patients, which we'll call "pure research." The district court resolved cross motions to grant summary judgment in favor of the hospital, and the government appeals.

## I. Background

### A. Medicare

In general, Medicare bears its share of an institution's costs "related to the care furnished beneficiaries." 42 C.F.R. § 405.402(a) (1983). Hospitals used to receive reimbursements for inpatient services provided to Medicare beneficiaries on the basis of "reasonable cost"—an ex-post reimbursement of actual service costs. *See* 42 U.S.C. § 1395f(b)(1); *R.I. Hosp. v. Leavitt*, 548 F.3d 29, 39 (1st Cir. 2008). The reasonable cost system also covered certain allowable education costs of teaching hospitals. *See* 42 C.F.R. § 405.421(b) (1983) ("Approved educational activities means formally organized or planned programs of study usually engaged in by providers in order to enhance the quality of patient care in an institution."). But hospitals were not reimbursed for "[c]osts incurred for research purposes, over and above usual patient care," unless the research was "in conjunction with . . . the care of patients." 20 C.F.R. § 405.422(a)-(b) (1967) ("Where research is conducted in conjunction with and as part of

the care of patients, the costs of usual patient care are allowable to the extent that such costs are not met by funds provided for the research.").

To manage costs, in 1972, Congress modified the reasonable cost system to allow the Secretary to limit reimbursements. 42 U.S.C. § 1395x(v)(1)(A). It became clear that teaching hospitals were disadvantaged by this system because they have higher costs of service (they treat more severely ill patients, residents who are assigned to teaching hospitals both request more diagnostic tests and procedures and residents require more staff because they place demands on staff to educate them, *see Report to Congress Required by the Tax Equity and Fiscal Responsibility Act of 1982*, at 48-49 (Dec. 1982), *see also* H.R. Rep. No. 98-25(I), *reprinted in* 1983 U.S.C.C.A.N. 219, 359; S. Rep. No. 98-23, *reprinted in* 1983 U.S.C.C.A.N. 143, 192-93; H.R. Rep. No. 99-241(I) (1985), *reprinted in* 1986 U.S.C.C.A.N. 579, 592)), but they received the same limited reimbursements as other hospitals. To compensate them for their costs not covered by the new limited reimbursements, in 1980, the Secretary of Health and Human Services established a teaching activity adjustment for teaching hospitals, based on the number of full-time equivalent (FTE) residents employed at a teaching hospital on a particular date. *See* 45 Fed. Reg. 21,582, 21,584 (Apr. 1, 1980); 47 Fed. Reg. 43,296, 43,310 (Sept. 30, 1982).

In 1983, Congress further attempted to limit Medicare costs with the prospective payment system (PPS) whereby the government reimbursed hospitals at a federal rate per given service based on a patient's diagnosis at dis-

charge, regardless of actual cost. Under the PPS, Medicare no longer reimbursed teaching hospitals for the operating costs associated with graduate education. 42 U.S.C. § 1395ww(a)(4). Congress enacted a teaching adjustment factor for indirect graduate medical education (IME) costs, based on the Secretary's teaching activity adjustment from the early 1980s, as a proxy for these higher costs. The adjustment was directly proportional to the number of FTEs.[1]

## B.  The regulation and statute at issue

This IME teaching adjustment is calculated "in the same manner as the adjustment for such costs under regulations (in effect as of January 1, 1983) . . . ." based on a detailed formula. *See* 42 U.S.C. § 1395ww(d)(5)(B). Although no on-point regulations appeared in the Code of Federal Regulations on January 1, 1983, the Secretary had issued several notices in the Federal Register, described above, that established a teaching adjustment and that defined FTE, a variable in the IME formula, based on the number of residents and interns employed full time or more and one-half the total number employed part time. 47 Fed. Reg. 43,296, 43,310 (Sept. 30, 1982). This Federal Register notice, then, was the basis for the regulation defining the FTE count for the IME adjustment

---

[1] Congress also allowed an adjustment for direct graduate medical expenses (DGME), e.g., salaries, stipends and classroom expenses, based on an FTE count. 42 U.S.C. § 1395ww(h). When we use the term FTE, we mean the IME FTE.

which, after several regulatory amendments, evolved into its 1996 version, at issue here. The 1996 version of the regulation provides that, for residents enrolled in approved teaching programs:

> In order to be counted, the resident must be assigned to one of the following areas:
>
>    A. the *portion* of the hospital subject to the [PPS]
>
>    B. the outpatient department of the hospital[2]
>
>    C. . . . any entity receiving a grant under section 330 of the Public Health Service Act.

---

[2] In 1985, Congress amended the relevant statute to require reimbursement for residents working in outpatient departments of hospitals, which overrode the Secretary's determination earlier that year to exclude these residents from the FTE count because they were performing services still compensated under the reasonable cost system. *See* Consolidated Omnibus Reconciliation Act of 1985 (COBRA), Pub. L. No. 99-272 § 9104; 50 Fed. Reg. 35,646, 35,681-82 (Sept. 3, 1985) ("It is important to note that Medicare, in fact, continues to pay for outpatient services on a reasonable cost basis, and these costs include the indirect costs of services performed by interns and residents treating outpatients. Continuing to pay for them under the indirect medical education adjustment, while simultaneously paying on a reasonable cost basis, would pay for their indirect costs twice."). Congress did not provide much explanation for the decision to override the secretary's earlier decision to exclude from the FTE count residents assigned to outpatient areas. *See* H.R. Rep. No. 99-241(I) (1985), *reprinted in* 1986 U.S.C.C.A.N. 579, 593.

42 C.F.R. § 412.105(g)(1)(ii) (1996) (emphasis added). A resident's FTE status "is based on the total time necessary to fill a residency slot," 42 C.F.R. § 412.105(g)(1)(iii), and some residents may be counted as "partial [FTEs] based on the proportion of time assigned to an area of the hospital listed in paragraph (g)(1)(ii) . . . compared to the total time necessary to fill a full-time internship or residency slot." *Id*.

In 2001, to "reiterate . . . longstanding policy regarding time that residents spend in research," 66 Fed. Reg. 22,646, 22,699 (May 4, 2001); *see also* 66 Fed. Reg. 39,828, 39,896-97 (Aug. 1, 2001), the Secretary again amended the regulation at issue, this time to address (for a subsequent period) the issue in this appeal. The Secretary excluded from the FTE count, for a "portion of the hospital subject to the [PPS]" and the "outpatient department," "time spent by a resident in research that is not associated with the treatment or diagnosis of a particular patient." 42 C.F.R. § 412.105(f)(1)(iii)(B) (2001) (the regulation had been moved to subsection (f) after 1996). This amendment was parroted in new statutory provisions enacted as part of the health care reform legislation of this year, discussed more fully below.

## C.  Administrative and district court decisions

In fiscal year 1996, the hospital included in its Medicare IME FTE count time residents spent on pure research. After several levels of administrative review, the Administrator of the Centers for Medicare and Medicaid Services excluded this time from the count. The Administrator reviewed Medicare's legislative and regulatory

history and concluded that, under the "reasonable cost" system and the PPS, indirect costs *un*related to patient care were never reimbursed under Medicare, and that the applicable regulation governing the FTE count must be interpreted to exclude those pure research costs from the possible reimbursable costs. The Administrator held that the regulation at issue is best read by inter-preting "area" to be "sphere or scope of operation or action" and by construing "assigned" as an operational term. Supp. App. 38. The Administrator noted that, because Medicare is a financing program, Medicare conceives of a hospital as containing cost-reporting areas rather than as a physical facility.

The district court disagreed with the Administrator and held that "outpatient department" and "portion" clearly referred to geographical locations within the hospital facility. *Univ. of Chi. Med. Ctr. v. Sebelius*, 645 F. Supp. 2d 648, 653-54 (N.D. Ill. 2009). It interpreted "area" as limited to its geographical definition because "outpatient department" "clearly denotes a geographic location" and therefore held that "portion" has a geo-graphic meaning because "area" does. 645 F. Supp. 2d at 654 (applying the interpretive principle that a word used multiple times in the same section of an enactment or regulation has the same effect throughout). Conse-quently, reasoned the district court, the plain text of the regulation did not allow the Secretary to decrease the hospital's IME reimbursement because the hospital's residents were in the portion of the hospital subject to PPS, even if they were conducting pure research. *See id.* at 655.

## II.  Discussion

### A.  The parties' positions

The questions on appeal are whether the hospital's residents in 1996 were assigned to (A) "the portion of the hospital that is subject to the [PPS]" and whether the Secretary's interpretation of the regulation comports with the underlying statute. The hospital reads the terms "portion", "area" and "assigned" to be spatial or geographical terms and argues that the regulation is clear on its face. That is, the hospital argues that, if the hospital assigns its residents to the right places when the FTE count is made—i.e., one of the physical spaces in the hospital where services are compensated under the PPS system—their time should be reimbursed without further inquiry. Every district court to have addressed the issue, including the district court in our case, has held that the regulation at issue has no patient-care requirement and therefore has agreed with a version of the hospital's position. *See Henry Ford Health Sys. v. Sebelius*, 680 F. Supp. 2d 799 (E.D. Mich. 2009), *appeal docketed* No. 10-1209 (6th Cir. Feb. 22, 2010); *Univ. Med. Ctr. Corp. v. Leavitt*, No. 05-495, 2007 WL 891195 (D. Ariz. Mar. 21, 2007); *R.I. Hosp. v. Leavitt*, 501 F. Supp. 2d 283 (D. R.I. 2007), *rev'd*, 548 F.3d 29 (1st Cir. 2008); *Riverside Methodist Hosp. v. Thompson*, 2003 WL 22658129, [2003-2 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 301,341 (S.D. Ohio July 31, 2003).

The government argues that the regulation contains a patient-care requirement by reading the terms "portion", "area" and "assigned" to have a functional meaning. That

is, these terms condition Medicare reimbursement on the services or functions performed involving residents' activities. The government notes that PPS reimburses medical *services* for patient care, not *places* in the hospital and so "portion of the hospital that is subject to the [PPS]" is plausibly a functional concept as well as a physical location. The Secretary argues that, when residents are performing pure research, they are not "assigned" to the part of the hospital subject to the PPS because the only costs incurred in that "portion" are the patient-care-related, operating costs incurred while providing inpatient hospital services. The First Circuit agreed with the government. *R.I. Hosp. v. Leavitt*, 548 F.3d 29 (1st Cir. 2008). The words "patient care", of course, are not in the regulation.

To bolster their positions, the parties muster a variety of statutes, regulations, auditing practices, statements of legislative history and statements of the agency having a variety of vintages to argue about the underlying intent and purpose of the regulation. The government invokes the history of Medicare and argues that the IME was only meant to reimburse costs related to the care of patients. The hospital, for its part, argues that the IME had no such requirement and was an easy-to-administer, rough proxy for indeterminate indirect costs of teaching hospitals based on the number of residents relative to the size of the hospital. We agree that the plain language of the relevant part of the regulation, read in context, suggests that the Secretary should have been concerned only with the residents' location in

calculating the IME FTE count. Given the muddle surrounding adoption of a teaching adjustment to the PPS to help out teaching hospitals, however, the answer to whether the regulation allows the IME adjustment to reimburse teaching hospitals for the costs of their residents' pure research is less than clear. And, of course, if we were faced with a possibly ambiguous regulation, deference to the agency's construction of an ambiguous regulatory provision would be at its height. *See Auer v. Robbins*, 519 U.S. 452 (1997) (internal citations omitted); *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (we generally defer to the Secretary's interpretation of regulations, especially of complex and highly technical programs like Medicare). Luckily for us, however, Congress stepped into the fray and provided us with a clear, statutory answer.

## B. The Patient Protection and Affordable Care Act resolves this case

In March 2010, after oral argument in this appeal, the President signed into law health-care-reform legislation that amended the statute at issue. The parties disagree about whether these amendments affect the outcome of this appeal.

The Patient Protection and Affordable Care Act (PPACA), Pub. L. No. 111-148 § 5505 (2010) amended the relevant statute, 42 U.S.C. § 1395ww(d)(5)(B), in two ways that affect the calculation of the IME FTE and, particularly, whether costs incurred by residents per-

forming activities unrelated to patient care may be re-imbursed by Medicare. Congress specified that, effective January 1, 1983 the IME FTE count includes: "all the time spent by an intern or resident in an approved medical residency training program in *non-patient care activities, such as didactic conferences and seminars* . . . that occurs in the hospital." PPACA § 5505(b) (emphasis added), (c)(1). At the same time, it also clarified that, for periods after October 1, 2001 (and without "giv[ing] rise to any inference as to how the law in effect prior to such date should be interpreted"), "all the time spent by an intern or resident in an approved medical residency training program in *research activities that are not associated with the treatment or diagnosis of a particular patient* . . . shall not be counted." PPACA § 5505(b), (c)(3). Lastly, Congress addressed both research activities and non-patient care activities related to the reimbursements for direct graduate medical expenses (DGME), effective January 1, 2009. For the DGME FTE count, all residents' time is reimbursable, if residents, who are assigned to a non-provider setting "that is primarily engaged in furnishing patient care . . . [, are engaged in] non-patient care activities, such as didactic conferences and seminars, *but not including* research not associated with the treatment or diagnosis of a particular patient . . . ." PPACA § 5505(a), (c)(2) (emphasis added).[3]

---

[3] The term "non-patient care activities" appears nowhere else in the law. "Research activities" is used in unrelated provisions addressing the endeavors of those who may qualify for a tax

(continued...)

The parties dispute whether "non-patient care activities," includes as a subset "research activities that are not associated with the treatment or diagnosis of a particular patient." To us, in ordinary parlance, research activities are clearly a subset of non-patient care activities. In addition, the amendments to the DGME reimbursement also compel this understanding of the relation between the two clauses (i.e., the "but not including" language emphasized, *supra*).

The government responds that pure research is not a subset of non-patient care activities, and it calls these two "distinct regulatory categories," without citation. The government urges us to give teeth to the "no inferences" language of PPACA, to heed our warning that "statutory constructions that render another part of the same provision superfluous," should be avoided, *see Harrell v. U.S. Postal Serv.*, 445 F.3d 913, 925 (7th Cir. 2006) (internal citations omitted) and to remember the interpretive principle that the specific trumps the general. *See In re Gulevsky*, 362 F.3d 961, 963 (7th Cir. 2004). Under its reading, therefore, Congress provided no guidance about whether to allow Medicare reimbursements for pure research until periods after October 2001, but specified that the IME FTE includes the separate category of non-patient-care activities for all

---

[3] (...continued)

break for research related to "therapeutic discovery projects", PPACA § 9023, research related to some congenital-heart-disease-related programs, § 10411, and research for breast-cancer-related programs, § 10413.

periods post-1983. In the government's view, that is, Congress declined to step on our toes and, instead, intended to let us resolve this appeal without any statutory interference.[4]

The hospital has the stronger position regarding the effect of the PPACA on the present appeal because Congress spoke clearly when it retroactively allowed reimbursement for non-patient care activities starting in 1983.[5] This language calls into question the basic thesis underlying the government's argument, namely that Medicare doesn't (at least as of 1983) extend to non-patient-care activities when it reimburses the indirect costs of medical education. The government puts considerable weight on the no-inferences clause to argue that Congress left the issue with us and our sister circuits to address. We think, however, that this no-inferences provision is unclear at best and, in any event, does not contradict the clear meaning of the earlier language

---

[4] The government informs us that there is no relevant legislative history interpreting this section of the PPACA and the hospital likewise provides no legislative-history support for its position.

[5] As the hospital noted, the district court dismissed without discussion any arguments that the hospital's records were incomplete as to whether the residents were assigned to the portions of the hospital subject to the PPS or to the outpatient department. The district court's holding in favor of the hospital necessarily depended on this finding, and we see no reason to prolong this dispute by remanding the case as the government requests.

allowing reimbursement for non-patient care activities during the time period relevant to the present appeal.

We hold, therefore, that the hospital should have received reimbursement as part of its IME adjustment for pure research in 1996. We note that this position is contrary to the First Circuit's opinion, but the First Circuit did not have the opportunity to consider Congress's health-care legislation, and we believe that legislation is dispositive.

Because of this new statutory provision, therefore, the district court's judgment is AFFIRMED.