In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-3285

RUSH UNIVERSITY MEDICAL CENTER,

*Plaintiff-Appellee,*

*v.*

SYLVIA MATHEWS BURWELL,
Secretary of Health and
Human Services,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
Nos. 12 C 4672 & 12 C 4673 — **Joan H. Lefkow**, *Judge.*

ARGUED APRIL 14, 2014 — DECIDED AUGUST 18, 2014

Before WOOD, *Chief Judge*, and POSNER and FLAUM, *Circuit Judges*.

WOOD, *Chief Judge*. Teaching hospitals provide a valuable service to the public by training the next generation of doctors and medical professionals, but that benefit comes at a price: such hospitals experience significantly higher per-patient care costs than their non-teaching counterparts. To

compensate them for taking on this extra financial burden, the federal Medicare program provides additional reimbursement for expenses beyond the immediate costs of patient care. One such adjustment is for "indirect medical education" (IME) costs. It is designed to account for the time medical interns and residents (collectively "residents") spend in ways that enhance their ability to provide patient care but that are not connected to the treatment of any particular patient. The question before us is whether residents' time spent in research activities wholly unrelated to the diagnosis or treatment of patients may be counted as part of this indirect-education time. (We refer to that as "pure research" time.) Rush University Medical Center, the plaintiff in this case, asserts that the answer is yes, and it seeks Medicare reimbursements for these activities between the years 1983 and 2001.

Importantly, we do not write on a blank slate. The Secretary of Health and Human Services (Secretary) has interpreted the Medicare Act consistently since 1983 to exclude pure research activities from compensable IME costs. Congress codified this exclusion for Fiscal Years 2001 onward in the Patient Protection and Affordable Care Act of 2010 (the Affordable Care Act or ACA), but it explicitly declined to lay down a rule for the years 1983 to 2001. The Secretary has now promulgated a regulation excluding pure research from the IME cost calculation for all years since 1983. Before that regulation was on the books but after the passage of the ACA, the question whether pure research was compensable reached our court. We held that the relevant portion of the statute should be interpreted to include pure research in compensable IME costs for the 1983 to 2001 period. See *Univ. of Chi. Med. Ctr. v. Sebelius*, 618 F.3d 739 (7th Cir. 2010).

Rush operates a teaching hospital in Chicago. It sought to include its residents' pure research time in its IME cost calculation for Fiscal Years 1993, 1994, and 1996. The fiscal intermediary charged with administering Rush's Medicare reimbursements denied its request because of the regulation, and that denial was affirmed on administrative appeal. Rush then filed suit challenging that decision in the district court, and the court held that our *University of Chicago* decision compelled reimbursement of residents' time spent in pure research during the years at issue. It thus granted summary judgment in Rush's favor. We must now decide whether *University of Chicago* continues to control in light of the changed regulatory landscape.

## I

In 1983 the Medicare program shifted from using a reimbursement system to a prospective payment system, under which hospitals are paid for patient care based on specified rates and formulae for activities and procedures, regardless of the actual dollars and cents involved in the care. IME costs are calculated pursuant to a formula, under which one important input is the number of "full-time equivalent interns and residents" at the hospital. 42 U.S.C. § 1395ww(d)(5)(B)(ii). The latter figure is computed based on the number of hours residents spend conducting both "patient care activities" and qualifying "non-patient care activities." *Id.* § 1395ww(d)(5)(B)(iv), (d)(5)(B)(x).

The IME regulation in place when the switch in reimbursement methodologies occurred was silent about whether pure research time was included within the definition of "non-patient care activities." Before any statute or regulation spoke directly to the issue, the Secretary interpreted the stat-

ute in administrative adjudication to exclude pure research time from the IME formula. See *R.I. Hosp. v. Leavitt*, 548 F.3d 29, 34, 38 (1st Cir. 2008) (upholding that interpretation).

In 2001 the Department of Health and Human Services amended the relevant regulation. In its new form, the regulation provided that "[t]he time spent by a resident in research that is not associated with the treatment or diagnosis of a particular patient is not countable." 42 C.F.R. § 412.105(f)(1)(iii)(B) (2001). The regulation was further amended in 2006 to clarify that "[i]n order to be counted, a resident must be spending time in patient care activities … ." 42 C.F.R. § 412.105(f)(1)(iii)(C) (2006). A separate regulation defined "patient care activities" as "the care and treatment of particular patients, including services for which a physician or other practitioner may bill." 42 C.F.R. § 413.75(b) (2006).

In 2010 Congress passed the Affordable Care Act. Part of that complex statute addressed whether pure research costs were within the scope of the IME calculation. It provided, in relevant part:

> In determining the hospital's number of full-time equivalent residents for purposes of this subparagraph, all the time spent by an intern or resident in an approved medical residency training program in research activities that are not associated with the treatment or diagnosis of a particular patient, as such time and activities are defined by the Secretary, shall not be counted toward the determination of full-time equivalency.

42 U.S.C. § 1395ww(d)(5)(B)(x)(III). In contrast, Congress provided that certain didactic activities (such as conferences and seminars) would be included:

> In determining the hospital's number of full-time equivalent residents for purposes of this subparagraph, all the time spent by an intern or resident in an approved medical residency training program in non-patient care activities, such as didactic conferences and seminars, as such time and activities are defined by the Secretary, that occurs in the hospital shall be counted toward the determination of full-time equivalency … .

*Id.* § 1395ww(d)(5)(B)(x)(II). The statute also speaks to the extent to which these provisions are retroactive. On a general level, it states that "[e]xcept as otherwise provided, the Secretary of Health and Human Services shall implement the amendment made by this section in a manner so as to apply to cost reporting periods beginning on or after January 1, 1983." See Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 5505(c)(1), 124 Stat. 119, 661 (2010). A more targeted provision provides that "[the IME amendments] shall apply to cost reporting periods beginning on or after October 1, 2001. Such section, as so added, shall not give rise to any inference as to how the law in effect prior to such date should be interpreted." *Id.* § 5505(c)(3), 124 Stat. 119, 661.

On November 24, 2010, after notice and comment, the Secretary promulgated a rule amending her previous IME regulation in light of the Affordable Care Act. The new regulation provides, in relevant part:

> Effective for cost reporting periods beginning on or after January 1, 1983, except for research activities described in paragraph (f)(1)(iii)(B) of this section, the time a resident is training in an approved medical residency program in a hospital setting … must be spent in either patient care activities, as defined in § 413.75(b) of this subchapter, or in nonpatient care activities, such as didactic conferences and seminars, to be counted.

42 C.F.R. § 412.105(f)(1)(iii)(C). The research activities referred to in the first line are described in the 2001 amendment to the regulation, which said that "[t]he time spent by a resident in research that is not associated with the treatment or diagnosis of a particular patient is not countable." 42 C.F.R. § 412.105(f)(1)(iii)(B).

We decided *University of Chicago* in the brief period between the enactment of the Affordable Care Act and the Secretary's promulgation of the amended regulation. See 618 F.3d 739 (7th Cir. 2010). Without a regulation authoritatively interpreting the Affordable Care Act's retroactivity provisions, we held that "[t]he hospital has the stronger position regarding the effect of the [ACA] on the present appeal because Congress spoke clearly when it retroactively allowed reimbursement for non-patient care activities starting in 1983." *Id.* at 745. We found the provision of the Affordable Care Act directing that no inference should be drawn regarding the retroactivity for the period between 1983 and 2001 to be "unclear at best" and insufficient to "contradict the clear meaning of the earlier language allowing reimbursement for non-patient care activities during the [relevant] time period." *Id.*

This was our most recent word on the subject when Rush filed for IME cost reimbursements that included its residents' pure research time. If that time was properly included, the number of full-time equivalent residents for the purpose of calculating Rush's non-patient care activities would increase by 17.05 in Fiscal Year 1993, 19.29 in Fiscal Year 1994, and 18.47 in Fiscal Year 1996. All of the residents' research took place either on-site at the portion of the hospital covered by Medicare's prospective payment system, or in one of Rush's outpatient departments. The fiscal intermediary's sole reason for denying reimbursement of these costs was that residents' time spent in pure research activities could not be counted. Rush took an administrative appeal to the Provider Reimbursement Review Board, which affirmed the intermediary's decision. The Administrator of the Centers for Medicare & Medicaid Services, to whom the Secretary has delegated her authority to review the Board's decisions, affirmed.

Rush filed this suit under 42 U.S.C. § 1395oo(f)(1), which gives providers the right to obtain judicial review of the agency's reimbursement decisions. Though the initial challenge involved several aspects of the Secretary's reimbursement decision, this appeal is limited to the denial of reimbursement for pure research in the IME cost calculation. On that question, the district court held that it was bound by our decision in *University of Chicago* even though it proved inconsistent with the Secretary's later-promulgated regulation, because it understood our holding to be based on the unambiguous terms of the statute—terms that could not be disturbed by a contrary regulation.

## II

The problem of deciding whether a subsequent administrative regulation should be applied in spite of a contrary earlier judicial interpretation of a statute is not new. In *National Cable & Telecommunications Ass'n v. Brand X Internet Services*, the Supreme Court explained that "[a] court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." 545 U.S. 967, 982 (2005). This leaves considerable leeway for the agency: "Only a judicial precedent holding that the statute *unambiguously* forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction." *Id.* at 982–83 (emphasis added).

*Brand X* reflects one application of the traditional analysis used to evaluate agency interpretations of ambiguous statutes under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). As the Supreme Court said there, "First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. Under *Brand X*, a court must review its earlier interpretation of the statute at issue to see if its holding was compelled by unambiguous statutory language. If it was, then it would not have mattered if the agency interpretation were already in place because that interpretation would not have been enti-

tled to deference under the first step of *Chevron*. Presumably, a court evaluating its earlier opinion under *Brand X* should reach the same conclusion as it would if it were conducting a *Chevron* step-one analysis in the first instance.

*Brand X* thus directs us to return to our *University of Chicago* decision to determine whether it was, in essence, a *Chevron* step-one decision. In *University of Chicago*, we held that the IME cost calculation could include residents' pure research time based on our interpretation of the Affordable Care Act. After recognizing that the regulation in place before the Act's passage created a "muddle" surrounding the adjustment, we said that the Act "provided us with a clear, statutory answer." 618 F.3d at 744.

We contrasted the 1983 start date for counting "all the time spent by an intern or resident in an approved medical residency training program in non-patient care activities" with the portion of the statute providing that pure research would not be counted beginning with fiscal year 2001. *Id.* at 745. We also compared Congress's treatment of these expenses with its provision governing the teaching-hospital adjustment for "direct graduate medical expenses." The Affordable Care Act provides that such expenses are reimbursable for residents who engage in "non-patient care activities, such as didactic conferences and seminars, but *not including* research not associated with the treatment or diagnosis of a particular patient." *Id.* at 744 (quoting 42 U.S.C. § 1395ww(h)(4)(J)). We reasoned that Congress would have included the explicit exclusion for pure research without qualification if it had wanted pure research excluded from the IME calculation before 2001. We found ambiguous the statement that the decision to require the exclusion only

post-2001 "shall not give rise to any inference as to how the law in effect prior to such date should be interpreted." *Id.* at 745. Finally, we explained that "ordinary parlance" would put research activities within the category of non-patient care activities, making them reimbursable. *Id.* We therefore held that the pure research time must be reimbursed.

Both parties have been able to cull isolated language from *University of Chicago* to support their positions on whether that holding was based on the "unambiguous terms of the statute," in the sense *Brand X* used that term. See 545 U.S. at 982. On the one hand, we used terms such as "clear" and "dispositive" when describing the statute, and we said that our holding was based on the "plain language." On the other hand, we said that the Hospital had "the stronger position" on the statute's meaning, and that the statutory directive not to draw inferences about retroactivity was "unclear at best." That back-and-forth language, and the acknowledgment that the directive on retroactivity was "unclear at best," does not sound like the type of decision that *Brand X* contemplated.

A quote here and a quote there are ultimately less important than the core holding of the case. While the *University of Chicago* court took care to consider the statute in reaching its opinion, it did so at a time when it was without the benefit of a regulation based on the statute that it could evaluate. A statutory answer was thus required. We explicitly recognized ambiguity in some of the statute's terms, such as the no-inferences provision. In light of that analysis, we cannot say that the *University of Chicago* opinion held the statute to be sufficiently unambiguous as to divest the Secre-

tary of all power to promulgate regulations contrary to its holding.

Considering the regulation as if we were conducting the first step of the *Chevron* inquiry on a blank slate confirms this conclusion. Foremost in that analysis would be the statute's express delegation to the Secretary of the power to define "research activities" that are not compensable:

> [A]ll the time spent by an intern or resident in an approved medical residency training program in research activities that are not associated with the treatment or diagnosis of a particular patient, *as such time and activities are defined by the Secretary*, shall not be counted[.]

42 U.S.C. § 1395ww(d)(5)(B)(x)(III) (emphasis added). The statute also expressly delegates the power to define compensable "non-patient care activities":

> [A]ll the time spent by an intern or resident in an approved medical residency training program in non-patient care activities, such as didactic conferences and seminars, *as such time and activities are defined by the Secretary*, that occurs in the hospital shall be counted toward the determination of full-time equivalency … .

*Id.* § 1395ww(d)(5)(B)(x)(II) (emphasis added). When a statute specifically authorizes an agency to define a term, there is no need to consider whether the term is ambiguous and thus left to agency delegation. The logical assumption is that Congress thought there was work for the agency to do—namely, to define the covered time and activities. See *Women Involved in Farm Econ. v. U.S. Dep't of Agric.*, 876 F.2d 994,

1000–01 (D.C. Cir. 1989); see also *Chevron*, 467 U.S. at 843–44. In the face of this explicit delegation of the power to define the term at the heart of this appeal, we cannot say that the Secretary's regulation fails as a matter of *Chevron*'s first inquiry.

We also cannot ignore the ACA's "no-inferences" provision. It would be perverse to say that this provision directs us to draw a *clear* inference that Congress meant to include pure research in such costs. It does no such thing. When Congress said "no inference" it meant exactly that; it did not need to bold-face and capitalize the word "no" to get the message across.

Rush insists that the "plain language" of a law still controls the meaning of a term even when Congress expressly delegates authority to define the supposedly "plain" term to an agency. We cannot accept this argument. The plain language of the statute delegates definitional authority to the Secretary; to excise that portion would give the statute a new and unintended meaning. It would also undermine Congress's ability to delegate the power to define terms and thrust the courts into a role that Congress meant to reserve for the agency. As the Supreme Court has said, once there is a delegation of authority, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Chevron*, 467 U.S. at 844. This is true even if the court would have reached a different reading. *Id.* at 843 n.11.

Rush is essentially taking the position that even if Congress delegated authority to the Secretary, the Secretary's interpretation fails under the second step of the *Chevron* inquiry: "whether the agency's answer is based on a permissi-

ble construction of the statute." *Id.* at 843. This is the question to which we now turn.

## III

Once we determine that Congress intended to delegate authority to define a statutory term to an agency, we will give the agency's definition controlling weight unless it is based on an "impermissible construction of the statute." *Id*. Rush contends that any definition of "non-patient care activities" that excludes pure research is impermissible on these grounds and that the Secretary's regulation must therefore yield.

As Rush sees it, the Affordable Care Act divides all activities into two and only two mutually exclusive categories: "patient care activities" and "non-patient care activities." These categories, it continues, must encompass all activities a resident undertakes in the hospital. Since both are compensable in the IME cost formula, it concludes, the Secretary has exceeded her authority by placing "non-patient care activities" into a non-existent third category of hospital-based activities that are non-compensable. We have a number of problems with this line of reasoning. First, if a hospital is entitled to be reimbursed for both "patient-care activities" and "non-patient care activities," why bother with the adjectives? The statute would say just "activities." Second, it is hard to square Rush's position with Congress's decision to place pure research outside the realm of compensable activities for the period beginning in 2001, when § 1395ww(d)(5)(B) goes into effect under § 5505(c)(3) of the Affordable Care Act. Third, the ACA did not foreclose the possibility of pure research's falling outside the compensable categories of activity between 1983 and 2001.

To the contrary, it directed that no inference should be drawn about that period based on its post-2001 directive. Affordable Care Act § 5505(c)(3), 124 Stat. 119, 661.

In fact, there are good reasons to think that Congress affirmatively wanted to grant the Secretary the power to exclude pure research time from the IME costs calculation for periods before 2001. As the Secretary explained when promulgating the new regulations, her view on "non-patient care activities" is that the concept of "care" remains important; the activities must relate to the treatment of patients. For example, she explained, "didactic conferences and seminars" can include "administrative rotation[s], which would include resident training in the administrative aspects of medical care such as practice management," and may also "involve presentations or discussions related to the treatment of current patients." 75 Fed. Reg. 71,800, 72,144, 72,146 (Nov. 24, 2010). Moreover, didactic non-patient care activities tend to take place "when an intern or resident is otherwise assigned to a rotation primarily requiring the provision of patient care," whereas pure research is usually conducted in large blocks of time when a resident is not expected to render care to patients. *Id.* at 72,145–46. We can assume that this understanding of "non-patient care activities" is not required under the statute, but it is rational and consistent with the distinction Congress drew and the scope of its delegation to the Secretary.

Nor are we convinced that the distinction between the statutory definitions of Graduate Medical Expenses and IME costs *compels* the reading given in *University of Chicago*. Recall that the statute governing Graduate Medical Expenses explicitly excluded pure research from its definition of "non-

patient care activities." See 42 U.S.C. § 1395ww(h)(4)(J) ("…
non-patient care activities, such as didactic conferences and
seminars, but not including research not associated with the
treatment or diagnosis of a particular patient"). In *University
of Chicago* we found this a meaningful variation from the
IME provision, which did not contain an explicit exclusion of
research from the definition of non-patient care activities.
That observation may have supported a different outcome,
but it does not require one. Congress's silence on the matter
in the IME provision is not enough to suggest that it was
impermissible for the Secretary, exercising her statutory au-
thority, to interpret the same term—non-patient care activi-
ties—consistently in the two different parts of the statute.

   In short, this case is one in which the responsible agen-
cy's interpretation of a statute should be afforded deference
under *Chevron*. Confronted with an express delegation of au-
thority to the agency over a question that has long occupied
that agency's attention, and an explicit disclaimer by Con-
gress that it meant to send any signal about the correct in-
terpretation of the matter, we are not willing to override the
agency's position. Our colleagues in the Sixth Circuit came to
the same conclusion in *Henry Ford Health Systems v. Depart-
ment of Health and Human Services*, 654 F.3d 660 (6th Cir.
2011). They distinguished *University of Chicago* on the
ground that the intervening regulation, 42 C.F.R. § 412.105,
"converted a run-of-the-mine statutory interpretation case
into a *Chevron* case." *Id.* at 666. We agree with them.

## IV

   Congress delegated authority to the Secretary to deter-
mine whether residents' pure research activities should be
compensable as part of the IME cost formula for the period

from 1983-2001. The Secretary's determination that they should not is reasonable and entitled to deference. Our decision in *University of Chicago*, which at the time represented our best interpretation of the statute before the regulation was on the books, is no obstacle to affording the Secretary's regulation the deference that it is due. We therefore REVERSE the judgment of the district court. With no factual issues remaining to be decided, we REMAND for the entry of summary judgment in favor of the Secretary.